## PENSACOLA TELEGRAPH COMPANY v. WESTERN UNION TELEGRAPH COMPANY.

1. The powers conferred upon Congress to regulate commerce with foreign nations and among the several States, and to establish post-offices and post-roads, are not confined to the instrumentalities of commerce, or of the postal service known or in use when the Constitution was adopted, but keep pace with the progress of the country, and adapt themselves to the new developments of time and circumstances.

2. They were intended for the government of the business to which they relate, at all times and under all circumstances; and it is not only the right, but the duty, of Congress to take care that intercourse among the States and the transmission of intelligence are not obstructed or unnecessarily encumbered by State legislation.

3. The act of Congress approved July 24, 1866 (14 Stat. 221, Rev. Stat., sect. 5263 *et seq.*), entitled "An Act to aid in the construction of telegraph lines, and to secure to the government the use of the same for postal, military, and other purposes," so far as it declares that the erection of telegraph lines shall, as against State interference, be free to all who accept its terms and conditions, and that a telegraph company of one State shall not, after accepting them, be excluded by another State from prosecuting its business within her jurisdiction, is a legitimate regulation of commercial intercourse among the States, and is appropriate legislation to execute the powers of Congress over the postal service.

4. Nor is it limited in its operation to such military and post roads as are upon the public domain.

5. The statute of Florida approved Dec. 11, 1866, so far as it grants to the Pensacola Telegraph Company the exclusive right of establishing and maintaining lines of electric telegraph as therein specified, is in conflict with that act, and therefore inoperative against a corporation of another State entitled to the privileges which that act confers.

6. Without deciding whether, in the absence of that act, the legislation of Florida of 1874 would have been sufficient to authorize a foreign corporation to construct and operate a telegraph line within the counties of Escambia and Santa Rosa in that State, the court holds that a telegraph company of another State, which has secured a right of way by private arrangement with the owner of the land, and duly accepted the restrictions and obligations required by that act, cannot be excluded by the Pensacola Telegraph Company.

APPEAL from the Circuit Court of the United States for the Northern District of Florida.

In 1859, an association of persons, known as the Pensacola Telegraph Company, erected a line of electric telegraph upon the right of way of the Alabama and Florida railroad, from Pensacola, in Florida, to Pollard, in Alabama, about six miles north of the Florida line. The company operated the whole line until 1862, when, upon the evacuation of Pensacola by the Confederate forces, the wire was taken down for twenty-three miles, and Cooper's Station made the southern terminus. In 1864, the whole was abandoned, as the section of the country in which it was situated had fallen into the possession of the United States troops.

On the 1st of December, 1865, the stockholders met; and it appearing that the assets of the company were insufficient to rebuild the line, a new association was formed for that purpose, with the old name, and new stock to the amount of $5,000 subscribed. A resolution was adopted by the new company to purchase the property of the old, at a valuation put upon it in a report submitted to the meeting, and a new board of directors was elected.

A meeting of the directors was held on the 2d of January, 1866, at which the president reported the completion of the line to Pensacola, and a resolution was adopted, authorizing the purchase of wire for its extension to the navy-yard. The attorneys of the company were also instructed to prepare a draft of a charter, to be presented to the legislature for enactment.

On the 24th of July, 1866, Congress passed the following act : —

" AN ACT to aid in the construction of telegraph lines, and to secure to the government the use of the same for postal, military, and other purposes.

" Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that any telegraph company now organized, or which may hereafter be organized, under the laws of any State in this Union, shall have the right to construct, maintain, and operate lines of telegraph through and over any portion of the public domain of the United States, over and along any of the military or post roads of the United States which have been or may hereafter be declared such by act of Congress, and over, under, or across the navigable streams or waters of the United States : *Provided*, that such lines of telegraph shall be so constructed and maintained as not to obstruct the navigation of such streams and waters, or interfere with the ordinary travel on such military or post roads. And any of said companies shall have the right to take and use from such public lands the necessary stone, timber, and other materials for its posts, piers, stations, and other needful uses in the construction, maintenance, and operation of said lines of telegraph, and may pre-empt and use such portion of the unoccupied public lands subject to pre-emption through which its said lines of telegraph may be located as may be necessary for its stations, not exceeding forty acres for each station ; but such stations shall not be within fifteen miles of each other.

" SECT. 2. And be it further enacted, that telegraphic communications between the several departments of the government of the United States and their officers and agents shall, in their transmission over the lines of any of said companies, have priority over all other business, and shall be sent at rates to be annually fixed by the Postmaster-General.

" SECT. 3. And be it further enacted, that the rights and privileges hereby granted shall not be transferred by any company acting under this act to any other corporation, association, or person : *Provided, however*, that the United States may at any time after the expiration of five years from the date of the passage of this act, for postal, military, or other purposes, purchase all the telegraph lines, property, and effects of any or all of said companies at an appraised value, to be ascertained by five competent disinterested persons, two of whom shall be selected by the Postmaster-General

.of the United States, two by the company interested, and one by the four so previously selected.

"SECT. 4. And be it further enacted, that before any telegraph company shall exercise any of the powers or privileges conferred by this act, such company shall file their written acceptance with the Postmaster-General, of the restrictions and obligations required by this act." 14 Stat. 221; Rev. Stat., sect. 5263 *et. seq.*

All railroads in the United States are by law post-roads. Rev. Stat., sect. 3964; 17 Stat. 308, sect. 201.

On the 11th of December, 1866, the legislature of Florida passed an act incorporating the Pensacola Telegraph Company, and granting it "the sole and exclusive privilege and right of establishing and maintaining lines of electric telegraph in the counties of Escambia and Santa Rosa, either from different points within said counties, or connecting with lines coming into said counties, or either of them, from any point in this [Florida] or any other State." The capital stock was fixed at $5,000, with the privilege of increasing it to such an amount as might be considered necessary. The company was authorized to locate and construct its lines within the counties named, "along and upon any public road or highway, or across any water, or upon any railroad or private property for which permission shall first have been obtained from the proprietors thereof." In this act all the stockholders of the new association which had rebuilt the line were named as corporators. No meeting of the directors was held until Jan. 2, 1868, when the secretary was instructed to notify the stockholders "that the charter drawn up by Messrs. Campbell & Perry, attorneys, as per order of board, Jan. 2, 1866," had been passed.

On the 5th of June, 1867, the directors of the defendant, the Western Union Telegraph Company, a New York corporation, passed the following resolution, which was duly filed with the Postmaster-General: —

"*Resolved*, that this company does hereby accept the provisions of the act of Congress, entitled 'An Act to aid in the construction of telegraph lines, and to secure to the government the use of the same for postal, military, and other purposes,' approved July 24, 1866, with all the powers, privileges, restrictions, and obligations conferred and required thereby; and that the secretary be, and he

is hereby, authorized and directed to file this resolution with the Postmaster-General of the United States, duly attested by the signature of the acting president of the company and the seal of the corporation, in compliance with the fourth section of said act of Congress."

In 1872, the property of the Alabama and Florida Railroad Company, including its right of way and railroad, was transferred to the Pensacola and Louisville Railroad Company; and on the 14th of February, 1873, the legislature of Florida passed an act, which, as amended Feb. 18, 1874, authorized the last-named company " to construct, maintain, and operate a telegraph line from the Bay of Pensacola along the line of the said (its) road as now located, or as it may hereafter be located, and along connecting roads in said county to the boundary lines of the State of Alabama, and the said lines may connect and be consolidated with other telegraph companies within or without the State, and said company may pledge, mortgage, lease, sell, assign, and convey the property appertaining to the said telegraph lines, and the rights, privileges, and franchises conferred by this act, with full power in such assignees to construct, own, and operate such telegraph lines, and enjoy all the privileges, rights, and franchises conferred by this act; but in such case the said railroad company shall be responsible for the proper performance of the duties and obligations imposed by this act."

This was within the territory embraced by the exclusive grant to the Pensacola Telegraph Company.

On the 24th of June, 1874, the Pensacola and Louisville Railroad Company granted to the Western Union Telegraph Company the right to erect a telegraph line upon its right of way, and also the rights and privileges conferred by the acts of February, 1873 and 1874. The Western Union Company immediately commenced the erection of the line; but before its completion, to wit, July 27, 1874, the bill in this case was filed by the Pensacola Telegraph Company to enjoin the work and the use of the line, on account of the alleged exclusive right of that company under its charter. Upon the hearing, a decree was passed dismissing the bill, and this appeal was taken.

*Mr. Charles W. Jones,* for the appellant.

Except when prohibited or restricted by the provisions of the State Constitution, the legislature can grant exclusive privileges and franchises within its own jurisdiction. Cooley, Const. Lim. 281; *Gibbons* v. *Ogden,* 9 Wheat. 1; *West River Bridge Co.* v. *Dix et al.,* 6 How. 507; s. c. 16 Vt. 446; *The Binghamton Bridge,* 3 Wall. 51; *Shorter* v. *Smith,* 9 Ga. 529; *The Proprietors of the Piscataqua Bridge* v. *The New Hampshire Bridge et al.,* 7 N. H. 35; *Boston Water Power Co.* v. *Boston & Lowell Railroad Corporation et al.,* 23 Pick. (Mass.) 360; *Boston & Lowell Railroad Corporation* v. *Salem & Lowell Railroad Co. et al.,* 2 Gray (Mass.), 1; *California Telegraph Co.* v. *The Atlantic Telegraph Co.,* 22 Cal. 398; *Hazen et al.* v. *The Union Bank of Tennessee,* 1 Sneed (Tenn.), 115; *The People* v. *Bowen,* 30 Barb. (N. Y.) 24; *Livingston* v. *Van Ingen et al.,* 9 Johns. (N. Y.) 506; *Ogden* v. *Gibbons,* 4 Johns. (N. Y.) Ch. 150.

In Florida there were no such restrictions or prohibitions. On the contrary, by the express terms of sect. 3, art. 15, of her Constitution, the special statute of Dec. 11, 1866, incorporating the appellant and granting the exclusive privileges which are asserted in this suit, is valid.

That statute is not referred to in that of Feb. 14, 1873, or the amendatory act of 1874, and is, therefore, not repealed by a general repealing clause. *Crane* v. *Rider,* 22 Mich. 322; *State* v. *Mills,* 34 N. J. L. 177; *State* v. *Brannin,* 2 Zab. (N. J.) 485; *Fostick* v. *Perrysburg,* 14 Ohio St. 474.

The said statute of Dec. 11 is, however, a contract with the State, which cannot be impaired or modified without the company's consent. A subsequent statute interfering with that contract, or the rights thereunder vested, is inoperative and void. *Trustees of Dartmouth College* v. *Woodward,* 4 Wheat. 518; *State Bank of Ohio* v. *Knoop,* 16 How. 369; *Dodge* v. *Woolsey,* 18 id. 331; *Jefferson Branch Bank* v. *Skelly,* 1 Black, 436; *Franklin Branch Bank* v. *The State of Ohio,* id. 74; *The Binghamton Bridge, supra; Farrington* v. *Tennessee,* 95 U. S. 679.

The appellee is a New York corporation; and, in the absence of any legislation of Florida empowering it to exercise its corporate franchises in the latter State, can set up nothing in conflict with the exclusive rights of the appellant under its charter.

It has no existence or rights beyond the limits of the State which created it, except by the comity or the enabling acts of other States. *The Bank of Augusta* v. *Earle*, 15 Pet. 519 ; *Ohio & Mississippi Railroad Co.* v. *Wheeler*, 1 Black, 286 ; *Paul* v. *Virginia*, 8 Wall. 168 ; *Liverpool Insurance Co.* v. *Massachusetts*, 10 id. 566 ; *Railroad Company* v. *Harris*, 12 id. 65.

The act of 1874, under which the appellee claims by assignment from the Louisville & Pensacola Railroad Company, must be construed with reference to this settled principle. The assignment was not effectual to transfer any franchise, because the assignee was, in this instance, incompetent to take.

The act of Congress of July 24, 1866, has no bearing upon the case. It is in substantially the same terms as that of Aug. 4, 1852, 10 Stat. 28, which grants to any railroad, plank-road, or turnpike company the right of way through the public lands, and the right to take therefrom earth, stone, or wood, for the purpose of construction, and to select sites for depots and workshops. It extends, on certain conditions, efficient aid to any telegraph company whose authorized lines are to be established over the public domain. If it can be construed as conferring upon a corporation of one State the right in another State to do certain acts and enjoy certain privileges in connection with that domain, the indispensable condition is necessarily implied, that, by an enabling statute of such other State, the requisite capacity to do the acts or enjoy the privileges within her limits has been, or will be, bestowed on the corporation. It does not, *proprio vigore*, enlarge the corporate powers of any company, or authorize it to exercise them in a foreign jurisdiction. If it attempted to do so, it would, to that extent, be clearly void, as an assumption of a power which has been wisely and to the fullest extent lodged with the respective States.

But if the appellee was a Florida corporation, clothed with undisputed authority to establish and work its lines within the county of Escambia, the act would give her — what is not here in issue — a right of way only over the public domain. Congress did not possess, and could not grant, more. The United States acquires no proprietary interest in any railroad by declaring it a post-road. *Dickey* v. *Maysville & Lexington Turnpike Road Co.*, 7 Dana (Ky.), 113. The only objects thereby

attained or sought are the security of the mail and the protection of the postal service.

*Mr. Perry Belmont, contra.*

Telegraphing, as practised by the respondent, is a part of that intercourse which constitutes commerce.

Restrictions upon the free right to erect and maintain telegraph lines operate to regulate that intercourse.

Such restrictions, when imposed, by State authority, are void, as contravening the Constitution of the United States.

The act of the legislature of Florida, approved Dec. 11, 1866, relied on by the appellant, not only trespasses upon the domain of Congress, but assumes to forbid what that body has authorized.

The question concerning the power of Congress to enable a corporation to exercise its franchises in a State other than that which created it, is not necessarily involved in determining the rights of the parties. The appellee is exercising certain franchises which the Pensacola and Louisville Railroad Company, pursuant to a statute of Florida, transferred to it by an assignment, which, except within the territory in question, it must be conceded, was as valid and effectual in vesting them as if they had been immediately derived from a legislative grant. The landed proprietors have granted to it the right of occupancy. It is, therefore, lawfully in that State, and has established connections there with its lines coming from other States. The case, therefore, turns upon the single point, whether, after complying with the conditions and regulations imposed by Congress, such a company so carrying on a commercial business may, with all its foreign and internal connections, be excluded, at the instance of another corporation, from certain portions of the State.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

Congress has power " to regulate commerce with foreign nations and among the several States " (Const. art. 1, sect. 8, par. 3); and " to establish post-offices and post-roads " (id., par. 7). The Constitution of the United States and the laws made in pursuance thereof are the supreme law of the land.   Art. 6, par. 2.

A law of Congress made in pursuance of the Constitution suspends or overrides all State statutes with which it is in conflict.

Since the case of *Gibbons* v. *Ogden* (9 Wheat. 1), it has never been doubted that commercial intercourse is an element of commerce which comes within the regulating power of Congress. Post-offices and post-roads are established to facilitate the transmission of intelligence. Both commerce and the postal service are placed within the power of Congress, because, being national in their operation, they should be under the protecting care of the national government.

The powers thus granted are not confined to the instrumentalities of commerce, or the postal service known or in use when the Constitution was adopted, but they keep pace with the progress of the country, and adapt themselves to the new developments of time and circumstances. They extend from the horse with its rider to the stage-coach, from the sailing-vessel to the steamboat, from the coach and the steamboat to the railroad, and from the railroad to the telegraph, as these new agencies are successively brought into use to meet the demands of increasing population and wealth. They were intended for the government of the business to which they relate, at all times and under all circumstances. As they were intrusted to the general government for the good of the nation, it is not only the right, but the duty, of Congress to see to it that intercourse among the States and the transmission of intelligence are not obstructed or unnecessarily encumbered by State legislation.

The electric telegraph marks an epoch in the progress of time. In a little more than a quarter of a century it has changed the habits of business, and become one of the necessities of commerce. It is indispensable as a means of inter-communication, but especially is it so in commercial transactions. The statistics of the business before the recent reduction in rates show that more than eighty per cent of all the messages sent by telegraph related to commerce. Goods are sold and money paid upon telegraphic orders. Contracts are made by telegraphic correspondence, cargoes secured, and the movement of ships directed. The telegraphic announcement of the markets abroad regulates prices at home, and a prudent mer-

chant rarely enters upon an important transaction without using the telegraph freely to secure information.

It is not only important to the people, but to the government. By means of it the heads of the departments in Washington are kept in close communication with all their various agencies at home and abroad, and can know at almost any hour, by inquiry, what is transpiring anywhere that affects the interest they have in charge.   Under such circumstances, it cannot for a moment be doubted that this powerful agency of commerce and inter-communication comes within the controlling power of Congress, certainly as against hostile State legislation.   In fact, from the beginning, it seems to have been assumed that Congress might aid in developing the system ; for the first telegraph line of any considerable extent ever erected was built between Washington and Baltimore, only a little more than thirty years ago, with money appropriated by Congress for that purpose (5 Stat. 618) ; and large donations of land and money have since been made to aid in the construction of other lines (12 id. 489, 772 ; 13 id. 365 ; 14 id. 292).  It is not necessary now to inquire whether Congress may assume the telegraph as part of the postal ser-vice, and exclude all others from its use.   The present case is satisfied, if we find that Congress has power, by appropriate legislation, to prevent the States from placing obstructions in the way of its usefulness.

The government of the United States, within the scope of its powers, operates upon every foot of territory under its jurisdic-tion.   It legislates for the whole nation, and is not embarrassed by State lines.   Its peculiar duty is to protect one part of the country from encroachments by another upon the national rights which belong to all.

The State of Florida has attempted to confer upon a single corporation the exclusive right of transmitting intelligence by telegraph over a certain portion of its territory.  This embraces the two westernmost counties of the State, and extends from Alabama to the Gulf.   No telegraph line can cross the State from east to west, or from north to south, within these counties, except it passes over this territory.   Within it is situated an important seaport, at which business centres, and with which those engaged in commercial pursuits have occasion more or less

to communicate. The United States have there also the necessary machinery of the national government. They have a navy-yard, forts, custom-houses, courts, post-offices, and the appropriate officers for the enforcement of the laws. The legislation of Florida, if sustained, excludes all commercial intercourse by telegraph between the citizens of the other States and those residing upon this territory, except by the employment of this corporation. The United States cannot communicate with their own officers by telegraph except in the same way. The State, therefore, clearly has attempted to regulate commercial intercourse between its citizens and those of other States, and to control the transmission of all telegraphic correspondence within its own jurisdiction.

It is unnecessary to decide how far this might have been done if Congress had not acted upon the same subject, for it has acted. The statute of July 24, 1866, in effect, amounts to a prohibition of all State monopolies in this particular. It substantially declares, in the interest of commerce and the convenient transmission of intelligence from place to place by the government of the United States and its citizens, that the erection of telegraph lines shall, so far as State interference is concerned, be free to all who will submit to the conditions imposed by Congress; and that corporations organized under the laws of one State for constructing and operating telegraph lines shall not be excluded by another from prosecuting their business within its jurisdiction, if they accept the terms proposed by the national government for this national privilege. To this extent, certainly, the statute is a legitimate regulation of commercial intercourse among the States, and is appropriate legislation to carry into execution the powers of Congress over the postal service. It gives no foreign corporation the right to enter upon private property without the consent of the owner and erect the necessary structures for its business ; but it does provide, that, whenever the consent of the owner is obtained, no State legislation shall prevent the occupation of post-roads for telegraph purposes by such corporations as are willing to avail themselves of its privileges.

It is insisted, however, that the statute extends only to such military and post roads as are upon the public domain ; but this,

we think, is not so.   The language is, " Through and over any
portion of the public domain of the United States, over and
along any of the military or post roads of the United States
which have been or may hereafter be declared such by act of
Congress, and over, under, or across the navigable streams or
waters of the United States."   There is nothing to indicate an
intention of limiting the effect of the words employed, and they
are, therefore, to be given their natural and ordinary significa-
tion.   Read in this way, the grant evidently extends to the
public domain, the military and post roads, and the navigable
waters of the United States.   These are all within the domin-
ion of the national government to the extent of the national
powers, and are, therefore, subject to legitimate congressional
regulation.   No question arises as to the authority of Congress
to provide for the appropriation of private property to the uses
of the telegraph, for no such attempt has been made.   The use
of public property alone is granted.   If private property is re-
quired, it must, so far as the present legislation is concerned,
be obtained by private arrangement with its owner.   No com-
pulsory proceedings are authorized.   State sovereignty under
the Constitution is not interfered with.   Only national privi-
leges are granted.

The State law in question, so far as it confers exclusive rights
upon the Pensacola Company, is certainly in conflict with this
legislation of Congress.   To that extent it is, therefore, inopera-
tive as against a corporation of another State entitled to the
privileges of the act of Congress.   Such being the case, the
charter of the Pensacola Company does not exclude the West-
ern Union Company from the occupancy of the right of way of
the Pensacola and Louisville Railroad Company under the
arrangement made for that purpose.

We are aware that, in *Paul* v. *Virginia* (8 Wall. 168), this
court decided that a State might exclude a corporation of an-
other State from its jurisdiction, and that corporations are not
within the clause of the Constitution which declares that " the
citizens of each State shall be entitled to all privileges and im-
munities of citizens in the several States."   Art. 4, sect. 2.
That was not, however, the case of a corporation engaged in
inter-state commerce ; and enough was said by the court to show,

that, if it had been, very different questions would have been presented. The language of the opinion is: "It is undoubtedly true, as stated by counsel, that the power conferred upon Congress to regulate commerce includes as well commerce carried on by corporations as commerce carried on by individuals. . . . This state of facts forbids the supposition that it was intended in the grant of power to Congress to exclude from its control the commerce of corporations. The language of the grant makes no reference to the instrumentalities by which commerce may be carried on: it is general, and includes alike commerce by individuals, partnerships, associations, and corporations. . . . The defect of the argument lies in the character of their (insurance companies) business. Issuing a policy of insurance is not a transaction of commerce. . . . Such contracts (policies of insurance) are not inter-state transactions, though the parties are domiciled in different States."

The questions thus suggested need not be considered now, because no prohibitory legislation is relied upon, except that which, as has already been seen, is inoperative. Upon principles of comity, the corporations of one State are permitted to do business in another, unless it conflicts with the law, or unjustly interferes with the rights of the citizens of the State into which they come. Under such circumstances, no citizen of a State can enjoin a foreign corporation from pursuing its business. Until the State acts in its sovereign capacity, individual citizens cannot complain. The State must determine for itself when the public good requires that its implied assent to the admission shall be withdrawn. Here, so far from withdrawing its assent, the State, by its legislation of 1874, in effect, invited foreign telegraph corporations to come in. Whether that legislation, in the absence of congressional action, would have been sufficient to authorize a foreign corporation to construct and operate a line within the two counties named, we need not decide; but we are clearly of the opinion, that, with such action and a right of way secured by private arrangement with the owner of the land, this defendant corporation cannot be excluded by the present complainant.

*Decree affirmed.*

MR. JUSTICE FIELD and MR. JUSTICE HUNT dissented.

MR. JUSTICE FIELD. I am compelled to dissent from the judgment of the court in this case, and from the reasons upon which it is founded; and I will state with as much brevity as possible the grounds of my dissent.

The bill was filed to obtain an injunction restraining the defendant from erecting, using, or maintaining a telegraph line in the county of Escambia, Florida, on the ground that, by a statute of the State passed in December, 1866, the complainant had acquired the exclusive right to erect and use lines of telegraph in that county for the period of twenty years. The court below denied the injunction and dismissed the bill, upon the ground that the statute was in conflict with the act of Congress of July 24, 1866, entitled "An Act to aid in the construction of telegraph lines, and to secure to the government the use of the same for postal, military, and other purposes." 14 Stat. 221.

The statute of Florida incorporated the Pensacola Telegraph Company, which had been organized in December of the previous year, and in terms declared that it should enjoy "the sole and exclusive privilege and right of establishing and maintaining lines of electric telegraph in the counties of Escambia and Santa Rosa, either from different points within said counties, or connecting with lines coming into said counties, or either of them, from other points in this or any other State."

Soon after its organization, and in 1866, the company erected a line of telegraph from the city of Pensacola, through the county of Escambia, to the southern boundary of Alabama, a distance of forty-seven miles, which has since been open and in continuous operation. It was located, by permission of the Alabama and Florida Railroad Company, along its line of railway. After the charter was obtained, the line was substantially rebuilt, and two other lines in the county were erected by the company.

In February, 1873, the legislature of Florida passed an act granting to the Pensacola and Louisville Railroad Company, which had become the assignee of the Alabama and Florida Railroad Company, the right to construct and operate telegraph

lines upon its right of way from the Bay of Pensacola to the junction of its road with the Mobile and Montgomery Railroad, and to connect the same with the lines of other companies. By an amendatory act passed in the following year (February, 1874), the railroad company was authorized to construct and operate the lines, not only along its road as then located, but as it might be thereafter located, and along connecting roads in the county, to the boundary of Alabama, and to connect and consolidate them with other telegraph companies, and to sell and assign the property appertaining to them, and the rights, privileges, and franchises conferred by the act; and it empowered the assignee, in such case, to construct and operate the lines, and to enjoy these rights, privileges, and franchises.

Under this amendatory act, and soon after its passage, the railroad company assigned the rights, privileges, and franchises thus acquired to the Western Union Telegraph Company, the defendant herein, a corporation created under the laws of the State of New York; which at once proceeded to erect a line from the city of Pensacola to the southern boundary of Alabama, along the identical railway on which the complainant's line was erected in 1866, and has been located ever since, with the avowed intention of using it to transmit for compensation messages for the public in the county and State. By the erection and operation of this line, the complainant alleges that its property would become valueless, and that it would lose the benefits of the franchises conferred by its charter.

There can be no serious question that the State of Florida possessed the absolute right to confer upon a corporation created by it the exclusive privilege for a limited period to construct and operate a telegraph line within its borders. Its Constitution, in existence at the time, empowered the legislature to grant exclusive privileges and franchises to private corporations for a period not exceeding twenty years. The exclusiveness of a privilege often constitutes the only inducement for undertakings holding out little prospect of immediate returns. The uncertainty of the results of an enterprise will often deter capitalists, naturally cautious and distrustful, from making an investment, without some assurance that, in case the business become profitable, they shall not encounter the danger of its

destruction or diminution by competition. It has, therefore, been a common practice in all the States to encourage enterprises having for their object the promotion of the public good, such as the construction of bridges, turnpikes, railroads, and canals, by granting for limited periods exclusive privileges in connection with them. Such grants, so far from being deemed encroachments upon any rights or powers of the United States, are held to constitute contracts, and to be within the protecting clause of the Constitution prohibiting any impairing of their obligation.

The grant to the complainant was invaded by the subsequent grant to the Pensacola and Louisville Railroad Company. If the first grant was valid, the second was void, according to all the decisions of this court, upon the power of a State to impair its grant, since the Dartmouth College Case. The court below did not hold otherwise, and I do not understand that a different view is taken here; but it decided, and this court sustains the decision, that the statute making the first grant was void, by reason of its conflict with the act of Congress of July 24, 1866.

With all deference to my associates, I cannot see that the act of Congress has any thing to do with the case before us. In my judgment, it has reference only to telegraph lines over and along military and post roads on the public domain of the United States. The title of the act expresses its purpose; namely, "To aid in the construction of telegraph lines, and to secure to the government the use of the same for postal, military, and other purposes." The aid conferred was the grant of a right of way over the public domain; the act does not propose to give aid in any other way. Its language is, that any telegraph company organized under the laws of a State "shall have the right to construct, maintain, and operate lines of telegraph through and over any portion of the public domain, over and along any of the military and post roads which have been or may hereafter be declared such by act of Congress, and over and across the navigable streams or waters of the United States." The portion of the public domain which may be thus used is designated by reference to the military and post roads upon it. Were there any doubt that this is the

correct construction of the act, the provision which follows in the same section would seem to remove it; namely, that any of the said companies shall " have the right to take and use from *such public lands* the necessary stone, timber, and other materials for its posts, piers, stations, and other needful uses in the construction, maintenance, and operation of said lines of telegraph, and may pre-empt and use such portion of the *unoccupied public lands*, subject to pre-emption, through which its said lines of telegraph may be located, as may be necessary for its stations, not exceeding forty acres for each station, but such sections shall not be within fifteen miles of each other." In the face of this language, the Italics of which are mine, there ought not to be a difference of opinion as to the object of the act, or as to its construction. The conclusion reached by the majority of the court not only overlooks this language, but implies that Congress intended to give aid to the telegraph companies of the country, — those existing or thereafter to be created, — not merely by allowing them to construct their lines over and along post-roads upon the public lands, but also over and along such roads within the States which are not on the public lands, where, heretofore, it has not been supposed that it could rightfully exercise any power.

The only military roads belonging to the United States within the States are in the military reservations; and to them the act obviously does not apply. And there are no post-roads belonging to the United States within the States. The roads upon which the mails are carried by parties, under contract with the government, belong either to the States, or to individuals, or to corporations, and are declared post-roads only to protect the carriers from being interfered with, and the mails from being delayed in their transportation, and the postal service from frauds. The government has no other control over them. It has no proprietary interest in them or along them to bestow upon any one. It cannot use them, without paying the tolls chargeable to individuals for similar uses; it cannot prevent the State from changing or discontinuing them at its pleasure; and it can acquire no ownership or property interest in them, except in the way in which it may acquire any other property in the States, — namely, by purchase, or by appropria-

tion upon making just compensation. *Dickey* v. *Turnpike Road Co.*, 7 Dana (Ky.), 113.

The public streets in some of our cities are post-roads, under the declaration of Congress (Rev. Stat., sect. 3964); and it would be a strange thing if telegraph lines could be erected by a foreign corporation along such streets without the consent of the municipal and State authorities, and, of course, without power on their part to regulate its charges or control its management. Yet the doctrine asserted by the majority of the court goes to this length: that, if the owners of the property along the streets consent to the erection of such lines by a foreign corporation, the municipality and the State are powerless to prevent it, although the exclusive right to erect them may have been granted by the State to a corporation of its own creation.

If by making a contract with a party to carry the mails over a particular road in a State, which thus becomes by act of Congress for that purpose a post-road, Congress acquires such rights with respect to the road that it can authorize corporations of other States to construct along and over it a line of telegraph, why may it not authorize them to construct along the road a railway, or a turnpike, or a canal, or any other work which may be used for the promotion of commerce? If the authority exist in the one case, I cannot see why it does not equally exist in the other. And if Congress can authorize the corporations of one State to construct telegraph lines and railways in another State, it must have the right to authorize them to condemn private property for that purpose. The act under consideration does not, it is true, provide for such condemnation; but if the right exist to authorize the construction of the lines, it cannot be defeated from the inability of the corporations to acquire the necessary property by purchase. The power to grant implies a power to confer all the authority necessary to make the grant effectual. It was for a long time a debated question whether the United States, in order to obtain property required for their own purposes, could exercise the right of eminent domain within a State. It has been decided, only within the past two years, that the government, if such property cannot be obtained by purchase, may appro-

priate it, upon making just compensation to the owner, *Kohl* v. *United States*, 91 U. S. 367; but never has it been suggested that the United States could enable a corporation of one State to condemn property in another State, in order that it might transact its private business there.

We are not called upon to say that Congress may not construct a railroad as a post-road, or erect for postal purposes a telegraph line. It may be that the power to establish post-roads is not limited to designating the roads which shall be used as postal routes, — a limitation which has been asserted by eminent jurists and statesmen.[1] If it be admitted that the power embraces also the construction of such roads, it does not follow that Congress can authorize the corporation of one State to construct and operate a railroad or telegraph line in another State for the transaction of private business, or even to exist there, without the permission of the latter State. By reason of its previous grant to the complainant, Florida was incompetent to give such permission to the assignor of the defendant, or to any other company, to construct a telegraph line in the county of Escambia. The act of the State of Feb. 3, 1874, in the face of this grant, can only be held to authorize the construction of telegraph lines by different companies in other counties. If, therefore, the defendant has any rights in that county, they are derived solely from the act of Congress.

A corporation can have no legal existence beyond the limits of the sovereignty which created it. In *Bank of Augusta* v. *Earle* (13 Pet. 519), it was said by this court that "it must dwell in the place of its creation, and cannot migrate to another sovereignty." And in *Paul* v. *Virginia* (8 Wall. 168), we added, that "the recognition of its existence even by other States, and the enforcement of its contracts made therein, depend purely upon the comity of those States, — a comity which is never extended where the existence of the corporation or the exercise of its powers is prejudicial to their interests or repugnant to their policy. Having no absolute right of recognition in other States, but depending for such recognition and the enforce-

---

[1] Elliott's Debates, edition of 1836, 433, 487; Views of President Monroe accompanying his veto message of May 4, 1822; Views of Judge McLean in his dissenting opinion in the *Wheeling Bridge Case*, 18 How. 441, 442.

ment of its contracts upon their assent, it follows, as a matter of course, that such assent may be granted, upon such terms and conditions as those States may think proper to impose. They may exclude the foreign corporation entirely, they may restrict its business to particular localities, or they may exact such security for the performance of its contracts with their citizens as in their judgment will best promote the public interest. The whole matter rests in their discretion." If, therefore, foreign corporations can exist in the State of Florida, and do business there by the authority of Congress, it must be because Congress can create such corporations for local business, — a doctrine to which I cannot assent, and which to my mind is pregnant with evil consequences.

In all that has been said of the importance of the telegraph as a means of intercourse, and of its constant use in commercial transactions, I fully concur. Similar language may be used with regard to railways; indeed, of the two, the railway is much the more important instrument of commerce. But it is difficult to see how from this fact can be deduced the right of Congress to authorize the corporations of one State to enter within the borders of another State and construct railways and telegraph lines in its different counties for the transaction of local business. The grant to the complainant in no way interferes with the power of Congress, if it possess such power, to construct telegraph lines or railways for postal service or for military purposes, or with its power to regulate commerce between the States. The imputation that Florida designed by the grant to obstruct the powers of Congress in these respects is not warranted by any thing in her statute. A like imputation, and with equal justice, might be made against every State in the Union which has authorized the construction of a railway or telegraph line in any one of its counties, with a grant of an exclusive right to operate the road or line for a limited period. It is true the United States, equally with their citizens, may be obliged in such cases to use the road or line; but it has not heretofore been supposed that this fact impaired the right of the State to make the grant. When the general government desires to transact business within a State, it necessarily makes use of the highways and modes of transit provided under

the laws of the State, in the absence of those of its own creation.

The position advanced, that if a corporation be in any way engaged in commerce it can enter and do business in another State without the latter's consent, is novel and startling. There is nothing in the opinion in *Paul* v. *Virginia* which gives any support to it.   The statute of Virginia, which was under consideration in that case, provided that no insurance company not incorporated under its laws should do business within the State, without previously obtaining a license for that purpose; and that it should not receive such license until it had deposited with the treasurer of the State bonds of a specified character to an amount varying from $30,000 to $50,000.   No such deposit was required of insurance companies incorporated by the State for carrying on their business within it; and in that case the validity of the discriminating provisions of the statute, between the corporations of the State and those of other States, was assailed.   It was contended, among other things, that the statute was in conflict with the power vested in Congress to regulate commerce among the several States; that the power included commerce carried on by corporations as well as that carried on by individuals; and that the issuing of a policy of insurance upon property in one State by a corporation of another State was a transaction of inter-state commerce.   The court replied, that it was true that the language of the grant to Congress made no reference to the instrumentalities by which commerce might be carried on; that it was general, and included alike commerce by individuals, partnerships, associations, and corporations; and that, therefore, there was nothing in the fact, that the insurance companies of New York were corporations, which impaired the argument of counsel, but that its defect lay in the character of the business; that issuing a policy of insurance was not a transaction of commerce; that the policies were mere contracts of indemnity against loss by fire, and not articles of commerce in any proper meaning of the term.   In other words, the court held that the power of Congress to regulate commerce was not affected by the fact that such commerce was carried on by corporations, but that a contract of insurance made by a corporation of one

State upon property in another State was not a transaction of inter-state commerce. It would have been outside of the case for the court to have expressed an opinion as to the power of Congress to authorize a foreign corporation to do business in a State, upon the assumption that issuing a policy of insurance was a commercial transaction. And it is impossible to see any bearing of the views, which were expressed, upon the doctrine advanced here, that a corporation of one State, in any way engaged in commerce, can enter another State and do business there without the latter's consent. Let this doctrine be once established, and the greater part of the trade and commerce of every State will soon be carried on by corporations created without it. The business of the country is to a large extent conducted or controlled by corporations; and it may be, as was said by this court in the case referred to, "of the highest public interest that the number of corporations in the State should be limited, that they should be required to give publicity to their transactions, to submit their affairs to proper examination, to be subject to forfeiture of their corporate rights in case of mismanagement, and that their officers should be held to a strict accountability for the manner in which the business of the corporations is managed, and be liable to summary removal." All these guards against corporate abuses the State would be incapable of taking against a corporation of another State operating a railway or a telegraph line within its borders under the permission of Congress, however extortionate its charges or corrupt its management. The corporation might have a tariff of rates and charges prescribed by its charter, which would be beyond the control of the State.; and thus, by the authority of Congress a State might be reduced to the condition of having the rates charges for transportation of persons and freight and messages within its borders regulated by another State. Indeed, it is easy to see that there will remain little of value in the reserved rights of the States, if the doctrine announced in this case be accepted as the law of the land.

The power vested in Congress to regulate commerce "among the several States" does not authorize any interference with the commerce which is carried on entirely within a State. "Com-

prehensive as the word 'among' is," says Chief Justice Marshall,
"it may very properly be restricted to that commerce which
concerns more States than one;" and "the completely internal
commerce of a State, then, may be considered as reserved for
the State itself." *Gibbons* v. *Ogden*, 9 Wheat. 194, 195.    That
commerce embraces the greater part of the business of every
State.    Every one engaged in the transportation of property or
persons, or in sending messages, between different points within
the State, not destined to points beyond it, or in the purchase or
sale of merchandise within its borders, is engaged in its com-
merce; and the doctrine that Congress can authorize foreign
corporations to enter within its limits and participate in this
commerce without the State's consent is utterly subversive of
our system of local State government.    State control in local
matters would thus be impossible.

The late war was carried on at an enormous cost of life and
property, that the Union might be preserved; but, unless the
independence of the States within their proper spheres be also
preserved, the Union is valueless.    In our form of government,
the one is as essential as the other; and a blow at one strikes
both.    The general government was formed for national pur-
poses, principally that we might have within ourselves uniform-
ity of commercial regulations, a common currency, one postal
system, and that the citizens of the several States might have in
each equality of right and privilege; and that in our foreign
relations we might present ourselves as one nation.    But the
protection and enforcement of private rights of both persons
and property, and the regulation of domestic affairs, were left
chiefly with the States; and, unless they are allowed to remain
there, it will be impossible for a country of such vast dimensions
as ours—with every variety of soil and climate, creating differ-
ent pursuits, and conflicting interests in different sections—to
be kept together in peace.    As long as the general government
confines itself to its great but limited sphere, and the States
are left to control their domestic affairs and business, there can
be no ground for public unrest and disturbance.    Disquiet can
only arise from the exercise of ungranted powers.

Over no subject is it more important for the interests and
welfare of a State that it should have control, than over corpo-

rations doing business within its limits.    By the decision now rendered, congressional legislation can take this control from the State, and even thrust within its borders corporations of other States in no way responsible to it.    It seems to me that, in this instance, the court has departed from long-established doctrines, the enforcement of which is of vital importance to the efficient and harmonious working of our national and State governments.

MR. JUSTICE HUNT.    I dissent, on the ground that the act of Congress was intended only to apply to telegraph lines constructed upon the public domain.

MR. JUSTICE HARLAN did not sit in this case, nor take any part in deciding it.