Spear, J.
The conviction was had under section 6880, of the Revised Statutes, which provides that: "Whoever wrongfully, and without lawful authority, cuts down or destroys, or by girdling, or any other means, injures any vine, bush, shrub, sapling, or tree, standing or growing upon land not his own, or severs from the land of another, or injures, or destroys, any product standing or growing thereon, or other thing attached thereto, shall *353 be fined in any sum not more than one hundred and fifty dollars, or imprisoned not more than thirty days, or both. ’ ’
Objection was made at the trial to the admission of any evidence under the indictment. • Exceptions were also taken to the refusal to charge divers propositions tendered by counsel for defendants. But the principal question in the case is raised by the exception to the following instruction given by the court to the jury, viz.:
“Upon the question as to the rights of the telegraph company, the court says to you that at the time of the erection of the poles and the construction of the telegraph line, whether in 1882 or 1884, the land upon which this highway was situated was the property of Mr. Taylor, subject to the right of way for public use for a highway; that is, for travel and keeping it in repair as a highway.
“As between Mr. Taylor and other individuals or corporations, it could be used for no other purpose without entitling him to compensation for such use; and the entry of this telegraph company upon his land without compensation to him, or without an agreement between him and such corporation, if you find this corporation did so enter, was not a rightful entry or occupancy; and as to the trees growing* upon this land at the time such company constructed its lines, as between him and such corporation he had the right to have the trees remain and grow there without injury, whether such injury was necessary or not to the use of the lines of such telegraph company. The United States could not, nor has it attempted to take away by any statute that right. Mr. Taylor’s right to maintain 'the trees in the ordinary way was an absolute right, and this right could be *354 taken from him in no way until such time as they acquired the right to maintain such lines by prescription, which means actual occupancy for twenty-one years or more, or by appropriation or agreement; and for this company, by its agents, without first acquiring' the right, to enter upon this land and to cut the trees growing thereon, would be proceeding without lawful authority.”
If this instruction is wrong the conviction cannot stand.
It is maintained by the plaintiffs in error that the charge is erroneous because The Postal Telegraph Cable Company derived authority by force of section 3454, and following, of the Revised Statutes of Ohio, and of section 5263, and following, of the Revised Statutes of the United States (by which its line is made an instrument of interstate commerce), to enter upon and occupy the highway for its telegraph line, and was therefore rightfully there for the purposes of its business, and that as it appears that what was done by the employes of the company in the way of trimming the trees of Mr. Taylor was done to prevent the branches from interfering with the operation of the telegraph line, their acts could not be in violation of any right of Mr. Taylor, inasmuch as he could not be possessed of any right to intrude, by growing trees or otherwise, upon the right of occupancy and use thus acquired and enjoyed by the company. Such acts would not be, within the meaning of our criminal statute, wrongful, nor could the land, as respects the company thus rightfully in occupancy of the highway, be esteemed the land of another within the meaning’ of section 6880.
*355 The sections of the Ohio statutes cited give authority to any magnetic telegraph company to construct telegraph lines from point to point along and upon any of the public roads and highways, etc., etc., but the same shall not incommode the public in the use of such highway. Any such company may enter upon any land, whether held by an individual or a corporation, and whether acquired by purchase or by appropriation, for the purpose of making preliminary examinations and surveys, with the view to the location of lines of magnetic telegraph, and may appropriate so much thereof as may be deemed necessary for the erection and maintenance of its poles, piers, abutments, wires, and other necessary fixtures, and for stations, and the right of way over such lands and adjacent lands sufficient to enable it to construct and repair its lines. But no such company shall, without the consent of the owner thereof in writing, enter any building or edifice, or. use or appropriate any part thereof, or erect any telegraph pole, pier ot abutment in any yard, or in any inclosure within which an edifice is situate, nor erect any telegraph pole, pier, abutment, wires, or other fixtures so near to any edifice as to occasion injury thereto, Or risk of injury in case such pole, pier or abutment be overthrown, nor injure or destroy any fruit or ornamental tree.
The sections of the United States statutes cited give to any telegraph company organized under the laws of any state the right to construct, maintain, and operate lines of telegraph over and along any of the military or post roads of the United States, but the lines must not interfere with the ordinary travel on such roads; and before any company can exercise any of the powers or privileges *356 conferred, such company shall file its writtenacceptance with the postmaster general of the restrictions and obligations required by law. A later section declares: “That all public roads and highways, while kept up and maintained as such, are hereby declared to be post routes. ’ ’
It is apparent that the only limitation expressed upon the right to maintain lines of telegraph upon the public highways, is that they shall be so constructed as not to interfere with the public use of the highway. But the statute nowhere undertakes to deal with the private rig-ht of ownership in the highways, and the question arises whether it was the legislative purpose to g-ive rights to telegraph companies inconsistent with the rights of the owner of adjoining lands in the highways.
Whatever may be the rule in other states, we have supposed that the question of the rig-ht in the highway of a landowner whose title extends to the center of the road, is not an open one in Ohio. The question has been the subject of adjudication in a score of cases decided by this court, notably in the following: Bingham v. Doane, 9 Ohio, 167; Crawford v. Delaware, 7 Ohio St., 459; Street Railway v. Cumminsville, 14 Ohio St., 523; Hatch v. Railroad Co., 18 Ohio St., 123; McClelland v. Miller, 28 Ohio St., 502; Railroad Co. v. Williams, 35 Ohio St., 168; Railroad Co. v. O'Harra, 48 Ohio St., 343. Perhaps the principle is not better stated than in Railroad v. Williams, supra, opinion by Gilmore, C. J., as follows:
“As between the public and the owner of land upon which a common highway is established, it is settled that the public has a right to improve and use the public highway in the manner and for the purposes contemplated at the time it was estab *357 listed. The right to improve includes the power to grade, bridge, gravel, or plank the road in such a manner as to make it most convenient and safe for use by the public, for the purposes of travel and transportation in the customary manner, which is well understood to be by the locomotion of man and beast and by vehicles drawn by animals, without fixed tracks or rails to which such vehicles are confined when in motion. These constitute the easement which the public acquires by appropriating land for the right of way for a highway, and these, in legal contemplation, are what the owner is ,to receive compensation for when his land is appropriated for this purpose. The fee of the land remains in the owner; he is taxed upon it; and when the use or easement in the public ceases, it reverts to him free from incumbrance.
“In the exercise of the right of eminent domain, the state, through the general assembly, may delegate to a railroad corporation the power to appropriate a right of way for its road along and upon a public highway. * * * In such case, the rights of the public, and the rights of the owner, are entirely distinct; and the consent, expressed or implied, of one to the appropriation, would not bind or affect the rights of the other. * * * The railroad company, by occupying the highway, constructing its track, and operating its trains thereon by steam motive power, completely diverted the highway from the uses and purposes for which it was established. This new use, to which the highway has been diverted, imposes burdens on the land that are entirely different from, and in addition to, those that were imposed by the highway. The right to so divert the use, and impose additional burdens on the land, could only be ae *358 quired by the corporation by agreement with the owner, or by appropriating and making eompensasation therefor, in the mode prescribed by law. ’ ’
Applying the doctrine of this holding to the case at bar, it is manifest that the learned trial judge did not err in his charge bearing upon the property right of Mr. Taylor in the highway, but •that, on the contrary, the law upon that subject was correctly stated to the jury. And, if right upon that point, the result would seem to follow, as further charged by the judge, that the landowner “had the right to have the trees remain and grow there without injury, whether such injury was necessary or not to the use of the lines of such telegraph company. ’ ’ The rule of law rests upon the clear ground that the appropriation of the public highways for the purpose of telegraph lines was a new use. The highways were originally dedicated for the purposes of public travel, and not for the purpose of telegraph lines. Hence the new use imposed an additional burden. The statutes of Ohio grant to telegraph companies secondary and subordinate, rather than co-ordinate, rights, with travelers, which fact is apparent in the provision that the lines are to be so constructed as not to interfere with the public use of the highways. (Railway Co. v. Telegraph Association, 48 Ohio St., 390.) The presence in the statute of provision for the protection of private rights where lines are built on private lands, and the absence of such provision where the highways are used, is strong indication, as it seems to us, that the purpose was to avoid any interference with the rights of the adjoining land owners. And the conclusion seems inevitable, taking the language of the entire statute upon the subject, that, what *359 ever grant oi right in the highways is given telegraph companies as against the public, no right is attempted to be given them as against individuals. The question of legislative power, therefore, to authorize a telegraph company to take the interest of the adjoining landowner in the highway withoht compensation, need not be considered.
It follows that before the telegraph company could possess a right in such measure as to interfere with the right of the landowner in the highway it would be required to acquire that right in some one of the ways known to the law. It is not pretended that any such method has been resorted to. Hence, the entry upon the land by the company, was, as to such right, not a rightful entry. There was no error, therefore, in the trial judge giving the instruction upon that subject already quoted.
The court also said to the jury “that in doing these acts, if these men in good faith honestly thought from the circumstances that they had the right to cut the trees as they' did, they could not within the meaning of the law be held to be guilty of a crime in this ease, even though they had no right or lawful authority so to do; however, if you find they acted heedlessly, recklessly and carelessly, without honestly believing they had the right to do it, then as to this branch of the case they would be liable. ” And this is assigned as error, because, as is urged, if the defendants honestly, though mistakenly, believed they had a right to cut the trees, the question of recklessness would not enter into the consideration, and they could not be guilty. We see no error in this instruction to the jury. Indeed, it is probably more favorable to the defendants than they could well ask. If, with the *360 information from Mr. Taylor, as to his ownership of the land and of the trees, and in the face of his protest, they chose to go on and do the injury complained of, it was for the jury to say whether or not they acted “heedlessly, recklessly and carelessly,” and if they did so act, then the cutting was “wrongful,” within the meaning of the statutes. That the cutting, if it injured the trees, would inflict pecuniary injury on Mr. Taylor, was apparent on the face of things. The trees were of value to the enjoyment of the property. Not only as a matter of sentiment on the part of the owner who had planted them and had watched their growth for near half a century, but as an improvement which added money value to the farm, had Mr. Taylor an interest in preserving them from injury, and in invoking the aid of the criminal law, where the superior force of the telegraph company made it impracticable for him to personally protect his own. That, too, was the time for him to stand for his own. The right in the company, if it existed, to set poles as near as one hundred and thirty feet from one another, with cross-arms six feet in length, and to put upon them fourteen wires, implied the right to place the poles as near together as the company might desire, and to put on them cross-arms of any length, and string a corresponding number of wires. And if there was the right to cut branches where necessary to the working of the line, there would arise an equal right to cut down the trees themselves in case a like necessity appeared. The landowner made resistance so soon as his property rights were directly assailed, but he did not resist any too soon.
*361 It is contended that the claim of the telegraph company to lawful possession as an instrument of inter-state commerce is sustained by the holding of the Supreme Court in The Pensacola Tel. Co. v. The W. U. T. Co., 96 U. S., 1. In that case it is held that the powers conferred upon congress to regulate commerce among the several states, and to establish postoffices and post roads, are not confined to the instrumentalities of commerce, or of the postal service known, or in use when the constitution was adopted, but keep pace with the progress of the country, and were intended for the government of the business to which they relate at all times and under all circumstances, and it is the duty of congress to take care that intercourse among the states and the transmission of intelligence are not obstructed or unnecessarily incumbered by state legislation. And, further, that the act of July 24, 1866 (section 5263, et seq.), which declares that the erection of telegraph lines shall, as against state interference, be free to all who accept its terms and conditions, and that a telegraah company of one state, shall not, after accepting them, be excluded by another state from prosecuting its business within her jusisdiction, is a legitimate regulation of commercial intercourse among the states, and is not limited in its operation to such military and post roads as are upon the public domain. And, as conclusion, that the statute of Florida, so far as it grants to the Pensacola company, the exclusive right of establishing and maintaining lines of electric telegraph as therein specified, is in conflict with that act, and therefore inoperative as against a corporation of another state entitled to the privileges which that act confers; and, further that a telegraph company of another *362 state, which has secured the right of way by private arrangement with the owner of the land, and duly accepted the restrictions and obligations required by that act, cannot be excluded by the Pensacola company.
But this is very far from holding that a telegraph company which accepts the terms of the United States statute, thereby acquires any right as against the individual property right of the citizen. True, the holding is that the telegraph is an instrument of inter-state commerce; that telegraph companies, are subject to the regulating-powers of congress, in respect to their foreign and inter-state business, and that such a company occupies the same relation to commerce as a carrier of messag-es, that a railroad company does as a carrier of goods. But how does this advance the argument? It is made plain, we think, by what has preceded, that the state cannot grant to a railroad company any right in a public highway which invades the individual right of the owner of adjoining land; such right may be acquired by due process of law; it cannot be legally seized by brute force. It is to be noted, also, that the Western Union company whose right is vindicated by the decision cited, “had secured a right of way by private arrangement with the owner of the land,” and hence the property rights of the citizen were in no way involved in the case. So solicitous, however, was the eminent jurist who wrote the opinion (Chief Justice Waite) that no unwarranted impression should be created, that he took pains to guard against it, when speaking of the statute, by use of the following language: “It gives no foreign corporation the right to enter upon private property without the consent of the owner and *363 erect the necessary structures for its business; but it does provide, that, whenever the consent of the owner is obtained, no state legislation shall prevent the occupation of post roads for telegraph purposes by such corporations as are willing to avail themselves of its privileges.” * * “No question arises as to' the authority of congress to provide for the appropriation of private property to the uses of the telegraph, for no such attempt has been made. The use of public property alone is granted. If private property is required, it must, so far as the present legislation is concerned, be obtained by private arrangement with its owner. No compulsory proceedings are authorized. State sovereignty under the constitution is not interfered with. Only national privileges are granted.”
It is manifest that the case is not an authority supporting the contention of the plaintiff in error.
Beyond this it is urged that, by not resisting the erection of the poles and the stringing of the wires when the line was placed along the highway some ten years before, Mr. Taylor is, in some way, estopped from now asserting his private rights, and hence it could not be made a criminal offense to invade those rights. Goodin v. Canal Co., 18 Ohio St., 169, is cited in support of this contention. The doctrine of the Goodin case was held in Railroad Co. v. Robbins, 35 Ohio St., 483, to ‘'rest upon its own peculiar facts, and is not to be extended,” and in the recent case of Railroad Co. v. Perkins, 49 Ohio St., 331, it is again observed, respecting the same case, that: “What is there said, must he confined to the facts of that case.” If, however, the doctrine of the Goodin case be at all applicable to the facts of the case at *364 bar, it ■would, only prevent a proceeding on the part of the landowner to compel a removal of the line. It could not work a transfer of the right of the landowner in the road to the telegraph company. That result, by reason of mere acquiescence, could not be accomplished short of twenty-one years. The private right, therefore, would not be extinguished. And, if not extinguished, that property right was still susceptible of protection by the criminal law. But, aside from this, even if the GoocLin case applies here, why should the landowner be estopped? The holding in the Goodin case proceeds upon the theory that the owners must have been fully aware of the appropriation proceedings, and that their property was being seized and despoiled, and upon the additional fact that large sums had been expended on the faith of their apparent acquiescence. In the case at bar it is not shown that at the time of the erection of the telegraph line the danger of interference with, or injury to, private property, was apparent, nor that expense has been incurred relying upon apparent acquiescence, nor, indeed, that any large sum has been expended at all.
Our conclusion is that the owner of the adjoining land was the owner of the trees, and had the rig'ht to their full enjoyment subject only to the convenience of public travel; that his property in the trees was a legitimate subject of protection by state legislation, and that the criminal arm of the law was properly invoked for his protection.
Other questions are argued, but we find none presented by the record of sufficient gravity to justify the use of time and the space in their discussion.

Jxidgment affi/rmed.