THE PEOPLE *v.* GÓMEZ.

APPEAL from the District Court of Humacao.

No. 119.—Decided February 25, 1908.

ASSAULT WITH INTENT TO COMMIT MURDER—ASSAULT AND BATTERY WITH
 AGGRAVATED CIRCUMSTANCES.—From a comparative examination of the pro-
 visions of subdivisions 8 and 9 of section 6 of the act defining assault and
 battery, approved March 10, 1904, and those of section 218 of the Penal Code,
 it will be seen that the difference between the crime of assault with intent
 to commit murder and the crime of assault with aggravated circumstances is
 principally a question of intent.
ID.—CRIMINAL INTENT.—A criminal intent is generally an element of every crime,
 but it is presumed that every person foresees the necessary consequences of
 his own acts intentionally performèd; the intent is an essential element of
 a crime of assault with intent to commit murder, and such intent must be
 specifically alleged and satisfactorily proved.
ID.—In order to show the intent with which an assault is made, it must be de-
 termined whether, in case the death of the assaulted person has been caused, it
 would constitute the crime of murder in the first or second degree.  If so,
 then it is an assault with intent to commit murder.  Otherwise it is a simple
 assault.  If the death of the assaulted person would constitute the crime of
 manslaughter, the assailant could not be convicted of an assault with intent
 to commit murder.  In order that the acts of the defendant may constitute
 the crime of assault with intent to commit murder, it is necessary that the
 assailant shall have especially sought to kill his victim.

The facts are stated in the opinion.

*Mr. Rossy, fiscal,* for respondent.

The appellant did not appear.

MR. JUSTICE MACLEARY delivered the opinion of the court.

The appellant, Rosendo Gómez, was accused, and prose-
cuted in the District Court of Humacao, of having assaulted
Esteban Levergne with the intent to murder him.  The infor-
mation was filed on the 6th of July, 1907.  It alleges the crime
to have been committed in the month of May preceding, in
the town of Caguas.  There is no exception taken to the in-
formation, and it is sufficient.  On the 7th of August the
accused was arraigned and pleaded not guilty.  A jury was
empanelled and a trial had, and the jury brought in a verdict
finding the defendant guilty of assault with intent to murder.

.The charge of the court was full and clear, and covered all the points. Judgment was at once pronounced, at the request. of the parties, and the defendant was condemned to eight years' imprisonment in the penitentiary at hard labor, and to the payment of the costs. An appeal was duly taken and the case filed in this court on the 11th of October last. A statement of facts appears in the record. On the 16th of January, 1908, the case was heard in this court on the oral argument and written briefs of both parties, and taken under consideration.

The appellant contends that the facts constitute only an aggravated assault under the act of 10th of March, 1904, amending and repealing section 237 of the Penal Code. If any part of the amendatory statute is applicable to the case at bar, it is paragraphs 8 and 9 of section 6; which reads as follows:

"An assault and battery becomes aggravated: when committed with deadly weapons under circumstances not amounting to an intent to kill or maim; when committed with premeditated design, and by the use of means calculated to inflict great bodily injury."

Comparing this statute with section 218 of the Penal Code in will be seen that the distinction between the two crimes of an aggravated assault and an assault with intent to commit murder is mainly a question of intent.

From the record the facts of this case appear to be substantially as follows:

The defendant, Rosendo Gómez, and the injured man, Esteban Levergne, at the time of the attack made by the one on the other, were both employed in the same factory at Caguas, the former as a foreman of a gang, and the latter as an accountant or clerk. Gómez attacked the wounded man, Levergne, on the 29th of May, 1907. On the afternoon of the previous day, at about 3 o'clock, Levergne, while working at his desk, saw about 25 women standing near by idle, and see-

ing Gómez near them called his attention to the fact, and Gómez replied that it was all right; then Levergne said: "How is it all right?" And Gómez answered: "Yes; because the baskets are full and they have to be emptied in order that they may continue their work;" to which Levergne replied: "Then the laborers who have to empty them are to blame."

A few minutes thereafter Conrado Santini came and sat down by side of Levergne; and the latter observed again that not only were the women who he had first seen idle, but others also, and called the attention of Santini to the fact, the latter being his superior. Then Santini made the same observation to Gómez in respect to the women. Gómez answered with an obscene expression, directing the same to Levergne. Thereupon Santini called his attention to the impropriety of his remarks, and Gómez marched off. Then Santini and Levergne agreed that Gómez should be discharged on account of this incident; and that afternoon at the conclusion of work he was discharged.

On the following day at about 8.30 in the forenoon, Levergne was sitting at his desk, very busy in the same house, and noticed that some one entered; he raised his eyes and saw that it was Gómez, and as he (Levergne) says, since if he (Gómez) had been discharged it was his own fault, he (Levergne) kept on at his work. When Gómez came quite near Levergne felt a blow, at least at first he thought it was a blow, and did not believe it was a wound. That the wound was made on the left side, next to the door at which Gómez entered, and it was he who aimed the blow. Levergne says that if he had known that Gómez came to give him a blow, he would not have given it to him. On receiving the blow all the tendons of the neck were severed and the wounded man felt such pain that he could take no account of anything. Then he came to and raised his hand to his neck, and at the same time directed his vision towards him (Gómez), and saw

him about a meter off, and then he was able to see the weapon with which he had committed the assault.

Levergne states that at that moment he believed he had only a few minutes to live, and he looked around for some weapon with which to defend himself; and when he made a movement to do so it seemed that Gómez realized that his victim was unarmed and rushed upon him again, and on seeing this Levergne caught up a bench which was there and took it by the legs; but, says he, when he tried to use it he felt that his left hand was completely powerless; that then he placed the bench in the attitude of defense; but just then two laborers arrived, who were coming to the scales with a wheelbarrow, and one of them said: "What are you doing, Rosendo?" That the laborers intervened at exactly the moment in which Gómez tried to assault Levergne again.

That at the moment in which Gómez dealt the blow he said to the injured man, "Take that," and some other words which the latter thought to be "you are the cause of it" or "you are the guilty one."

That this assault occured at Caguas in the warehouse of the company. That Levergne was over a month in recovering and at the trial had the scar of the wound on his face. That no altercation passed between Gómez and Levergne at the time the wound was inflicted. That the wound began from behind and extended forward. That it was given from the front. The wound was inflicted with a knife. That the two laborers, Thomas and Anastasio, caught Gómez, who had the knife in his hand still, after Levergne had been wounded, then he sought to shelter himself with the bench from the attack of Gómez at the time the latter was caught by the men. Another witness says that Gómez was in front of Levergne at the time the latter was wounded, and had entered silently— that is to say, without speaking. It also appears that Levergne's desk was about two steps from the door at which Gómez entered. The knife used in making the wound was produced at the trial in court.

It is argued by the appellant's counsel that he could have had no intention of killing Levergne since, after he inflicted the wound, he retired from his victim to a distance of one meter, in which place he was caught by the laborers who disarmed him. The evidence does not show any retreat on the part of the assailant; but it appears from the record that when the wounded man recovered a little from the shock and opened his eyes he saw his assailant at a distance of about a meter, with the weapon in his hand. That thereupon the assailant again rushed upon his victim and was caught and held and disarmed by persons arriving on the scene, and further bloodshed was prevented. These facts, which are undisputed are clearly sufficient to show the murderous intent and justify the jury in finding the verdict on which the judgment is based; there is nothing to show how long an interval passed between the blow and the arrest and disarming of the assailant; but from all the circumstances it must have been very short. And had it been longer it might have been inferred therefrom that the defendant was acting with greater deliberation; but the circumstances to show any faltering in the homicidal intent found by the jury are entirely absent from the record. More than 15 hours had passed since the provocation, insufficient as it was, had occurred; and the assailant armed himself and waited a convenient opportunity, and came to his victim's place of business where he, the defendant, had no right to be, and without a word of warning assailed him with a murderous weapon in a vital part, and only by fortuitous circumstances failed to kill him outright. Every man is presumed to intend the natural and logical consequences of his own acts. Judged by these standards the intent to kill was certainly sufficiently proven. The whole matter was left to the jury by the trial judge, in a very able and impartial charge, and their finding is conclusive of the question as to the guilty intent with which the assault was made.

Chief Justice Waite says, in the opinion rendered in the case of *Reynolds* v. *United States*, 96 U. S., 1:

"A criminal intent is generally an element of crime, but every man is presumed to intend the necessary consequences of what he knowingly does."

Section No. 219 of the Penal Code of Porto Rico is copied substantially from section 217 of the Penal Code of California; the only change being that one year longer punishment is allowed in the former than in the latter.

It has been well said by the Supreme Court of California in commenting upon this section of the Code that the intent is the gist of the offense, and it must be specifically averred and satisfactorily proved. (*People* v. *Islas*, 27 Cal., 630; *People* v. *Murat*, 45 Cal., 281; *People* v. *Swenson*, 49 Cal., 388; *People* v. *Pine*, 53 Cal., 264.)

The allegations and the proof are certainly not lacking in the case at bar.

A very common test of the intent with which an assault has been made is to inquire: Would the crime have been murder had death ensued therefrom? If so, it is an assault with intent to murder; otherwise it is only an assault of an inferior degree. This intent does not require that the result of the assault, in case of death, would have been murder in the first degree, but it is sufficient, if it would have been murder in the second degree, to raise the assault to a murderous one. However, if the death resulting from the assault would only have warranted a verdict of manslaughter, then when death did not follow the defendant could not be convicted of assault with intent to murder. Or as it is tersely stated in some of the California decisions: "A person cannot be convicted of the offense of assault with intent to murder, unless he would have been guilty of murder had death resulted from the assault. But to constitute an attempt to murder the wrongdoer must specifically intend to take life." (*People* v. *Mizo*, 80 Cal., 41; *Citing 1 Wharton's Crim. Law*, Sec. 641; *State*

v. *Neal*, 37 Me., 408; *State* v. *White*, 41 Iowa, 316; 20 *Am. Rep.*, 602; *Meredith* v. *State*, 60 Ala., 441.)

To the same effect are many decisions of the Supreme Court of Texas, and doubtless other States. The principles of law on this subject are so well settled that it is useless to prolong the discussion further. The facts justify the verdict; the charge was correct and no error appears in the record.

The judgment of the District Court of Humacao rendered in this case, on the 7th of August, 1907, should be in all things affirmed.

*Affirmed.*

Justices Hernández and Figueras concurred.

Chief Justice Quiñones and Mr. Justice Wolf did not take part in the decision of this case.