## GEORGIA R. & BANKING CO. v. ATLANTIC POSTAL TELEGRAPH CABLE CO.

(Circuit Court, S. D. Georgia, N. E. D.  April 20, 1907.)

1. REMOVAL OF CAUSES—CAUSES REMOVABLE—CONDEMNATION PROCEEDINGS.

A suit by a railroad company in a state court to restrain a telegraph company of different citizenship from maintaining proceedings to condemn a right of way for a telegraph line along the railroad's right of way, in which the railroad claimed that the proposed structure would menace the safety of the railroad company's trains and obstruct its business, presented a justiciable issue which was removable to the federal court.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 42. Removal of Causes, §§ 11, 23, 85.

Proceedings under power of eminent domain as civil suits under laws relating to removal of causes to federal courts, see note to South Dakota C. Ry. Co. v. Chicago, M. & St. P. Ry. Co., 73 C. C. A. 183.]

2. EMINENT DOMAIN—APPRAISERS—POWERS—TELEGRAPHS—RIGHT OF WAY.

Under the laws of Georgia appraisers appointed in proceedings by a telegraph company to condemn a right of way along the right of way of a railroad have no authority except to assess the value of the property and consequent damages.

3. CONTRACTS—LEGALITY — RESTRAINING COMPETITION — TELEGRAPH LINES — RIGHT OF WAY—EXCLUSIVE CONTRACT—VALIDITY.

A contract between a railroad company and a telegraph company by which the latter is granted the exclusive right of occupancy of the railroad's right of way for the maintenance of a telegraph line is void.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, § 551.]

4. EMINENT DOMAIN—DEFENSES—TELEGRAPHS—RIGHT OF WAY—INJUNCTION.

Where a telegraph company sought to condemn a right of way along the right of way of a railroad, and in its proposition stated that the height of its poles above the ground would not exceed the distance from the poles to the end of the nearest cross-ties, the railroad company was not entitled to an injunction restraining the prosecution of such condemnation proceedings because its right of way was already encumbered by a rival telegraph line and that the effect of complainant's line would be to seriously interfere with the railroad's business and would constitute a menace to the safety of its tracks and trains.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 18, Eminent Domain, § 770.]

In Equity.

Joseph B. & Bryan Cumming, for complainant.

C. E. Dunbar and Felder, Rountree & Wilson, for defendant.

SPEER, District Judge. The complainant, a corporation of this state, is the owner of certain lines of railroad. The main line extends from Augusta to Atlanta. Important branch lines extend from Barnett, on the main line, to Washington, from Union Point to Athens, and from Camak to Macon. Although the property is leased to other companies, it is highly valuable. The title of the corporation is the "Georgia Railroad & Banking Company," but for convenience will be here termed the "Georgia Railroad." The public along its lines, and probably the railroad itself, are already served with telegraphic facilities by the Western Union Telegraph Company. The defendant, the Atlantic Postal Telegraph Cable Company, is a corporation of the state of New York. It has attempted to acquire a portion of the right of way, for the purpose of erecting and conducting its business with the various towns and cities, on the line of the Georgia Railroad. The Postal Company, as we will term it; finding its overtures rejected, instituted condemnation proceedings under sections 5263–5269, inclusive, of the Revised Statutes of the United States [U. S. Comp. St. 1901, pp. 3579–3590], and under sections 4657–4686, inclusive, of the state Civil Code of 1895. The object of this proceeding is to condemn such parts of the complainant's right of way along the line stretching from the city of Augusta to the city of Atlanta, and from Camak to the city of Macon, for the purposes of the Postal Company's telegraphic business. The notification of the Postal Company, as amended, which is the basis of the proceeding under the state laws, is as follows:

"To the Georgia Railroad & Banking Company, and to the Louisville & Nashville Railroad Company, and the Atlantic Coast Line Railroad Company, lessees:

"The Atlantic Postal Telegraph Cable Company (hereinafter called the 'Telegraph Company') a corporation organized under the laws of the state of New York, and engaged in the telegraph business with connecting telegraph lines throughout the United States of America and the Dominion of Canada, and with cable connections throughout the world, is desirous of constructing, maintaining, and operating a line of telegraph poles and wires along, upon, over, and across certain lands, property, and right of way of the Georgia Railroad & Banking Company (hereinafter called the 'Georgia Railroad') from and to the points, and through the counties, in the state of Georgia, hereinafter set forth.

"The said Telegraph Company, preferring to secure, by contract, the right and privilege of constructing, maintaining, and operating its telegraph lines along, upon, over, and across said lands, property, and right of way of said Georgia Railroad, heretofore made an earnest effort to agree with said Georgia Railroad for said right and privilege, and to agree upon the compensation to be paid by it to said Georgia Railroad, but the said Georgia Railroad failed and refused to give its consent to it for such right and privilege, and failed and refused to agree upon the compensation to be paid by it therefor.

"The said Telegraph Company, therefore, proposes under and by virtue of the authority of an act of Congress of the United States of America, sections 5263 to 5269, inclusive, of the Revised Statutes of the United States, and subsequent amendments thereof by said Congress, the provisions of which have been accepted by said Telegraph Company, as well as by authority of the stat-

utes of the state of Georgia providing for the condemnation of private property and for the condemnation by a telegraph company of a portion of the right of way of a railroad for the purpose of constructing, maintaining, and operating its telegraph line along and upon such right of way (Civ. Code 1895, §§ 4657 to 4686, inclusive, and the act of the Legislature approved December 20, 1898, p. 54), to condemn and acquire an easement or privilege along, upon, and over the right of way of the said Georgia Railroad, its poles to be erected as near the outer edge of said right of way as circumstances will permit, and in such position as not to interfere with the operation or safety of trains, or with the use of the right of way by said Georgia Railroad, or by the Louisville & Nashville Railroad Company, and the Atlantic Coast Line Railroad Company, lessees, for its or their own purposes, and on the side of the right of way other than that upon which is now erected the line of the Western Union Telegraph Company, from a point where the Georgia Railroad right of way crosses Gwinnett street in the city of Augusta, Ga., westwardly through the counties of Richmond, Columbia, McDuffie, Warren, Taliaferro, Green, Morgan, Walton, Newton, Rockdale, and De Kalb, to the county line between the counties of Fulton and De Kalb, at a point near the city of Atlanta, in the state of Georgia, and also through and from Camak, Warren county, Ga., through the counties of Warren, Hancock, Baldwin, Jones, and Bibb, to a point in Bibb county 74 miles from Camak, and 4 miles from Macon, and known as 'Central Railroad Junction,' being the place where the Georgia Railroad trains go onto the tracks of the Central of Georgia Railway Company.

"The said Telegraph Company proposes by said condemnation proceeding to condemn so much of the right of way of said Georgia Railroad between the points and through the counties mentioned as may be necessary for its use for the purpose of constructing, maintaining, and operating its telegraph line along, upon, and over said right of way, which said telegraph line it will construct as follows:

"Said line will be constructed with the best material and in accordance with the established and well-recognized rules governing safe and proper construction and maintenance.

"The poles will be about 12 inches in diameter at the base, and will be carefully and firmly planted from 4 to 8 feet in the ground, according to the length of the pole.

"All poles not on a straight line, all terminal poles, and all crossing poles will be firmly braced or supported by guy wires and anchors.

"The distance from each pole to the end of the nearest cross-tie of the main track shall not be less than 20 feet, and the height of each of the poles above ground shall not be more than 20 feet, excepting only where a railroad, a highway, or another line of poles and wires crosses said right of way, or there are buildings or other improvements upon said right of way which necessitate higher poles for safe and proper construction and for clearance. The poles will be placed so as not to interfere with the ordinary travel or use of said railroad, and about 150 feet apart, making about 35 poles to the mile, with cross-arms about 10 feet long at or near the tops of the poles and fastened about the middle of the cross-arms to the poles. Along and upon these cross-arms or poles, or upon said cross-arms and poles, will be strung a sufficient number of wires to transact such business as will be given said Telegraph Company by the United States government and the public, so that the ordinary travel upon and use of said railroad will not be interfered with by reason thereof, which telegraph line the Telegraph Company intends in good faith to construct, maintain, and operate in the manner set out in this notice.

"The Telegraph Company says that the only land that will be actually taken or occupied by it by virtue of this proceeding will be about one square foot for each pole; that the space between the poles and under the wires can be used by the Georgia Railroad, or its said lessees, for all the purposes for which it has heretofore been used, and whenever it becomes necessary, if it does at all, to cross said right of way, said crossing will be made by having its poles at such crossings so erected, and its wires so insulated and strung so high above said railroad track, as to prevent any injury to or interference with the employés or property of the Georgia Railroad.

152 F.—63

"The Telegraph Company further stipulates that it will not interfere with. any other telegraph or telephone lines upon said right of way, and further-more, if at any time the said Georgia Railroad, or its successors, or its said lessees, shall desire, for railroad purposes, the immediate use of any land occupied by it, then, in such event, upon reasonable notice in writing, the Telegraph Company will, at its own expense, remove its line to some other place adjacent thereto on such right of way, so as not to interfere with the use of said right of way for railroad purposes, and that its line will not be erected on any embankment or slope, or in any cut on said right of way, and if, at any time, said railroad company, or its said lessees, shall require for railroad purposes its entire right of way at any point where the Telegraph Company's line may be constructed on said right of way, the Telegraph Company will, at such point or points, remove its line entirely off of said right of way, thereby recognizing the prior rights of the Georgia Railroad, its successors, or its said lessees to its entire right of way for railroad purposes, and that the construction, maintenance, and operation of said telegraph line, as aforesaid, will be of no actual damage to said Georgia Railroad, or its said lessees, in any sum whatever, and will not cause its right of way to be diminished in value for railroad purposes, and that the just compensation or damage to which the Georgia Railroad, or its said lessees, may be entitled from the Telegraph Company for the right and privilege herein sought, is merely nominal.

"The Telegraph Company proposes, by this one condemnation proceeding to be had in Richmond county, to condemn and acquire an easement in and to said railroad right of way throughout the several counties hereinbefore named for the purpose of constructing and maintaining and operating its telegraph line thereon, and the assessors shall make their findings for the damage to which said Georgia Railroad, and the said Louisville & Nashville Railroad Company, and the Atlantic Coast Line Railroad Company, lessees thereof, may jointly or severally be entitled by reason of the construction, maintenance, and operation of said telegraph line in the manner hereinbefore set out, and that the whole right and controversy may be determined by this proceeding in Richmond county, into and through which the right of way extends, and in which county the Louisville & Nashville Railroad Company and the Atlantic Coast Line Railroad Company, lessees as aforesaid, each has an office, but not the main and principal office of either of said last-named companies, and said Louisville & Nashville Railroad Company being a foreign corporation, created and existing under the laws of the state of Kentucky, and having its main or principal office in the city of Louisville, said state, and the said Atlantic Coast Line Railroad Company being a foreign corporation, created and existing under the laws of the state of Virginia, and having its main or principal office in the city of Richmond, said state, but each of said last-named corporations has an agent in Richmond county on whom service can be made as provided by the laws of the state of Georgia.

"The Telegraph Company, through its board of directors, by resolution selected and declared the right of way of the Georgia Railroad, which is hereby sought to be condemned, as the most safe and practicable post road for the construction, maintenance, and operation of its telegraph line to be constructed from and to the points herein named, wherein it will connect with its other lines, constructed or to be constructed, leading all over the United States and connecting with its cable lines across the Atlantic and Pacific Oceans, and, furthermore, authorized and directed its counsel, Felder & Rountree, to negotiate with the said Georgia Railroad for the right and privilege herein sought, and failing therein, to proceed by proper legal proceedings in the name of said Telegraph Company to acquire a right of way for said telegraph line on the right of way of the said Georgia Railroad as herein set out, and its president and treasurer were directed to pay such compensation therefor as may be finally adjudged and directed to be paid by the company in said proceeding.

"The said Georgia Railroad and the said Louisville & Nashville Railroad Company and the said Atlantic Coast Line Railroad Company, lessees as aforesaid, are hereby notified that the said Telegraph Company named Mr. William E. Bush as the assessor selected by it, and the said Georgia Railroad, and the said Louisville & Nashville Railroad Company, and the said Atlantic

Coast Line Railroad Company, lessees as aforesaid, are requested to select an assessor, and that the 29th day of January, 1906, is fixed as the time when the hearing will be had in the office of the ordinary of the county of Richmond, or at such place as the assessors may fix, at which time the said assessors will proceed to hear evidence and take such proceedings as contemplated by the statutes in such cases made and provided."

Pursuant to this purpose, the defendant company had served the railroad company with the notification above set forth, and had nominated an appraiser to act with two other persons in assessing the damages to the complainant's property and business, as provided by law. The Georgia Railroad at once resisted this proceeding. It filed in the superior court of Richmond county the situs of its principal office, the bill in equity now before us. Under the state law this may be done in any one county on the railroad right of way, and the proceeding there will suffice to make it effective along the whole line. The bill prays that the Postal Company be perpetually enjoined from erecting poles, cross-arms, and wires on all parts of its right of way, because such structures would be an obstruction to the business of petitioner, or a menace to the safety of its tracks and trains. Inasmuch as it contends that by the statutes for the condemnation of private property the issues presented in the petition can be adjudicated, it prays that the court may determine the same, and decree whether and at what localities the telegraph company can legally condemn a right of way. It also prays that an injunction may be granted against the further action of the appraisers, one of whom, conformably to the statute, has been named by the Postal Company, and the other by the ordinary of Richmond county (the third not having been selected). There is also a prayer for general relief. The Postal Company, by reason of diversity of citizenship, has removed the entire cause to this court. We esteem that the bill and its various defenses present the justiciable issue, and that the controversy is removable.

In its notification to the Georgia Railroad, which was the beginning of the proceeding, the Postal Company states that its line of poles will be so constructed that "the ordinary travel upon and use of said railroad will not be interfered with by reason thereof." This conforms with the Revised Statutes of the United States, § 5263. Under the laws of Georgia the appraisers have no other authority save to assess the value of the property and consequent damages. The Georgia Railroad contends that the right of the Postal Company to condemn this right of way is merely conditional, and is subordinate to its own prior right to the land and to protect the same from noninterference and nonimpairment of its facilities to perform its duties as common carrier. The railroad further insists that the installation of a line of poles will seriously interfere with "ordinary travel." This is denied by the Telegraph Company, and the issue thus made is supported on either hand by copious expert testimony presented in the form of affidavits. There was no insistent application for a temporary injunction, and while the case is pending upon affidavits, these are so comprehensive, and counsel on both sides—since the record has been completed—having submitted their briefs, and failing to offer oral argument, the present status of the controversy may be perhaps treated as a consent submission on the

proofs for final decree. Whether this is true or not, it is evident that the application is for final hearing for injunction. It is probably optional, however, to either party to take the proofs conformably with the rules in equity, and to insist upon further hearing for the settlement of the terms of the decree, although in view of the character of the record this would seem superfluous.

Most of the proof is expert testimony submitted in the form of voluminous affidavits. Of these, the complainant presents 19. The affiants are mainly civil engineers, railroad men, and other experts in the service of the parties. There is much similarity and, indeed, uniformity in the style and phraseology of these affidavits. They are substantially as follows:

"Deponent is informed that there are stretches of various lengths, aggregating 18 miles of the right of way of the Georgia Railroad, where the width of the right of way from the center of the main track to the outer edge of the right of way is not exceeding 20 feet; other stretches aggregating upward of two miles, where the width, measured as above, does not exceed 15 feet; and other stretches aggregating 9,100 feet, where said railroad has no right of way, except that covered by the superstructure of a single track. Predicating it on the facts above stated, deponent gives it as his opinion that the poles, cross-arms, and wires of a telegraph company could not be established on the parts of the right of way indicated without interfering with the proper operation and functions of the railroad, for the following reasons. * * *"

The court is then supplied with the affidavit literature of which the complainant attempts to avail itself to justify the technical or professional opinion of the expert. Much of this is cumulative, and the court does not regard it as justifying an inexorable rule, which in this day and time will prevent a telegraph company from properly, and with all due caution, establishing a new and secure line on a right of way, originally given by grant or eminent domain, and where a previous telegraph line has long been in use.

For instance, a Mr. Morton Riddle, a civil engineer in the employ of the Atlantic Coast Line Railroad, one of the lessee companies, testifies that there is always danger of telegraph and telephone poles blowing down, or being broken by sleet, and that no line of poles should be permitted to be nearer the track than the length of the pole above ground; that the poles should not be nearer than 8 feet from the center of the track to prevent injury to trainmen. He says that a second track is often necessary, and should not be less than 13 feet from its center to the center of the main line, and therefore a pole nearer than 21 feet from the center of the main line would be a source of danger. This is in effect the testimony of J. M. Stephens, formerly superintendent of the Western Union Telegraph Company in Atlanta. He testifies that the proximity of the poles would endanger their falling across the track as the result of decay, wind storms, heavy sleet, or other causes.

Mr. Charles A. Wickersham, president and general manager of the Atlanta & West Point Railroad Company, makes affidavit that telegraph poles and wires are more or less a menace when placed in close proximity to a railroad track, on account of fires burning the poles and causing them to fall. He states that during a sleet storm of 1905 several hundred telegraph poles were strewn across the tracks of the

various lines in his section, causing delay to the trains; and that the more poles and wires there are on the right of way, the more danger of accidents. These conditions, while obviously distressing, would in this day scarcely embarrass the wonderful profession of engineering, which has woven the gigantic suspension bridge, constructed the transcontinental railway, conducts mighty steamships over the shallows where Israel escaped and Pharaoh perished, and even now is rushing to completion that Isthmian canal, which for more than 400 years has quickened the imagination of the discoverer, the geographer, and the statesman.

Testimony of this general character might be cited ad libitum. Many of the witnesses are in the employ of the lessee, or of dominant, or connecting companies. But their testimony is obvious and undeniable. It is also undeniable that there is danger in the erection of all telegraphic facilities in close proximity to railway lines on curves, or elsewhere. Nevertheless, they are constantly erected, and many of them bear so many lines of wire that to the naked or inexpert eye they are practically countless. Communication by telegraph is perhaps of all others the most speedy and reliable method of intercourse in that vast domain of commerce which is under the control of the general government, and because one telegraph company has secured a prior occupancy for its lines, it is quite impossible for the courts to hold that other companies may not, with due regard and precaution for the safety of the general public and the employés of the railroad company, institute additional lines. Certainly in many cases, perhaps in a majority of cases, where the country is thickly populated, and the use of the telegraph is continuous, it is indispensable that there should be competing lines along the same right of way to accomplish fair service to the public. To secure such facilities in which the public is deeply concerned is one of the most important and vital duties of modern government.

To extend the argument drawn from these affidavits to its logical conclusion, it might be made to appear impossible, not only to maintain with safety a second line, but the first line also. It is obvious that there may be danger in either of them. Nay, more, since a cross-tie may become rotten, a steel rail wear out or warp, or a spike work loose from the cross-tie, the possibilities enumerated by the complainant would forbid the construction of so portentous and threatening an instrumentality of commerce as the railway itself. Defects in construction and inspection may appear anywhere. That they appear every day we know, but the utilization for the service of mankind of those marvelous powers of steam and electricity is not to be forbidden on that account.

We are not at liberty to ignore altogether the testimony of the defendant's witnesses. There is the testimony of Mr. Benjamin S. Price who is the defendant's superintendent of construction. He has had an experience of 20 years in the construction of telegraph lines on railroad rights of way. He states that the maintenance of such a line is no menace to the safety of trains, where the poles are not placed nearer than 8 feet from the nearest rail, if properly constructed. They should be, he testifies, 12 inches in diameter, and set 4 to 8 feet in the

ground. All of the poles are not in a straight line, and all terminal and crossing poles are uniformly anchored, braced, or supported by guy wires. This witness testifies that he has constructed lines on the Illinois Central, Chicago, Indianapolis & Louisville, Lake Shore & Michigan Southern, and other railroads. He says that there were two, and sometimes three, lines on many of these roads, and that thousands of poles were placed and maintained within 8 to 10 feet from the nearest rail. He testifies that he is familiar with telegraph lines throughout the country, and states that these poles are so erected that they will withstand storm, cyclone, or tornado, as successfully as trees or houses, and are as safe within 8 feet of the rail as warehouses and other buildings the same distance. He has never known an instance of damage to a railroad or its trains caused by the falling of a telegraph pole, although he has extensively traveled throughout the United States in all kinds of weather. The line constructed as proposed in this case would in his opinion in no way interfere with the operation of the railroad company's trains. Mr. Charles M. Baker, superintendent of construction for the Postal Company in the west, testifies to substantially the same facts. Mr. J. E. Nix, general foreman of construction for the defendant, in his affidavit gives a table of distances of poles of the Western Union Telegraph Company along the same lines now sought to be used by the defendant from Augusta to Atlanta. The heights of these poles vary from 25 to 40 feet, and the distances from the main track from 10 to 24 feet. In many places, he states, the heights of the poles exceed the distance from the nearest rail of the track. He further testifies that wire lines cross the tracks of the complainant more than 100 times, and are supported by ordinary poles sufficiently high for clearance—that is, to clear the trains—and that it is safe to erect and maintain a telegraph line within 8 feet of the nearest rail.

Besides, the court is not without valuable assistance from the rulings of the state Supreme Court. In Savannah, Florida & Western Railway Company v. Postal Telegraph Company, 112 Ga. 941, 38 S. E. 353, it was stated by the Supreme Court of Georgia:

"Whether or not the manner in which the telegraph company proposes to construct its lines and the location of the telegraph poles, wires, etc., upon the railroad company's right of way, as indicated in the notice served by the telegraph company upon the railway company in the condemnation proceeding, would so essentially injure or interfere with the necessary use by the railway company of its right of way for railroad purposes as to render the grant of an interlocutory injunction proper is a question to be determined by the trial judge, under the facts and circumstances submitted for his consideration."

It does not, however, follow, we think, that the conclusion of the trial judge is irrevocable. He is entitled to the corrective assistance which may be afforded by the distinguished judges of the appellate courts of that judicial system of which he is a member.

It is true that it is the obvious policy of the government of the United States to bring about and maintain a fair competition in telegraph rates. For instance, a contract between a railroad company and a telegraph company, granting exclusive right of occupancy on the railroad right of way, has been repeatedly declared to be void. United

States v. Union Pacific Railroad Company, 160 U. S. 1, 16 Sup. Ct. 190, 40 L. Ed. 319; Western Union Telegraph Company v. American Union Telegraph Company, 65 Ga. 160, 38 Am. Rep. 781. In Pensacola Telegraph Company v. Western Union Telegraph Company, 96 U. S. 1, 24 L. Ed. 708, Chief Justice Waite for the court declared:

The statute "substantially declares, in the interest of commerce and the convenient transmission of intelligence from place to place by the government of the United States and its citizens, that the erection of telegraph lines shall, so far as state interference is concerned, be free to all who will submit to the conditions imposed by Congress, and that corporations organized under the laws of one state for constructing and operating telegraph lines shall not be excluded from prosecuting their business within its jurisdiction, if they accept the terms proposed by the national government for this national privilege."

This language is reiterated in Western Union Telegraph Company v. Pennsylvania Railroad et al., 195 U. S. 562, 25 Sup. Ct. 133, 49 L. Ed. 312. It is then the policy of the law, so far as that is practicable with equal justice to all, to permit the use of the rights of way of railroad companies for telegraph lines. Nor are the state courts less backward in permitting this great public convenience. In the case of the Atlantic Railroad Company v. Postal Telegraph Company, 120 Ga. 269, 48 S. E. 20, Mr. Justice Evans for the court observes:

"The railway company insists that the erection of the poles is a menace to the safe operation of its road. We are unable to see how a telegraph pole of less height than the distance from its location to the track can be considered a menace to the operation of the road. It is possible that as the result of a, violent storm the poles may be blown down and across the track, but the possibility of such a result is so contingent that it is not a proper element in the assessment of damages. * * * Should an injury of this character result in damage to the railway company by reason of the defective or faulty construction of the telegraph line, it has an ample remedy for reimbursement; but it will not be presumed that such an injury may result in the ordinary course of affairs."

And in the same case, on page 280 of 120 Ga., page 20 of 48 S. E., the same learned justice declares:

"Instead of being damaged, it would seem that the railroad company, having the advantage of two lines, one on either side of its right of way, would be benefited, because of probable competition."

There are numerous cases sustaining these principles. One very much in point is that of the St. Louis & Cairo Railroad Company v. Postal Telegraph-Cable Company, 173 Ill. 508, 51 N. E. 382, where the telegraph company proposed to condemn a right of way of a railroad company, and to install poles not less than 25 feet long, 1 foot in diameter at the base, set in the ground at a depth of not less than 5 feet, and not less than 25 feet from the outer edge of the railroad track. The court there held:

"The location of the line, as indicated in the petition, shows that the public use of the railroad will not be seriously incommoded."

It is clear under the laws of Georgia that the Postal Company will not acquire the fee, but only an easement on the railroad's right of way. This will embrace the land actually occupied and the right of entry for construction and repair. Atlantic Railroad Company v. Postal Telegraph Company, 120 Ga. 276, 48 S. E. 15. It does not appear that

there will be any unjustifiable or unlawful interference with the complainant's right of way, or with its "ordinary travel," or that the railroad itself will be irreparably damaged. Under the laws of the state, if one person owned the entire right of way, which the Postal Company seeks to condemn for the purposes of its telegraph lines, the court, upon a proper case made, would permit the condemnation. Much more should it be granted against a corporation, which has been permitted to exercise the right of eminent domain over the same line as against the lands of private persons, and for its own purposes. In other words, the same principle which justifies the condemnation of the Georgia Railroad's right of way in the first instance, as against the landowners, will justify the use of an easement now on the same land against the railroad itself.

It would be difficult perhaps to set out a proposition more liberally and carefully drawn than that presented by the Postal Company in its notification, which was the basis of this case. The height of the poles above ground will not exceed the distance from the poles to the end of the nearest cross-ties. This will be 20 feet. In case a pole should fall under ordinary circumstances this will leave a margin of about two feet beyond the length of the pole and the distance from its base to the track. But the Georgia Railroad says that its right of way at certain points is too narrow for the telegraph company to execute its proposition. The proposition is, however, made, and at those attenuated points on the Georgia line where it seems to enjoy nothing but the roadbed, contiguous territory upon which a pole may rest will probably be found in the neighborhood. It is said, however, that the Georgia Railroad has certain curves where there might be a tendency of the wires to draw the poles upon the track. In railroad construction and maintenance curves are not novel, and it would seem easy enough by proper bracing to protect the roadbed and track. The Postal Company expressly agrees to do this. Besides, the Western Union Company for many years has maintained its lines; following, we may presume, the sinuosities of all those impracticable curves, and there is no proof in the record which justifies the belief that the wires of the Western Union have inflicted any injury upon the Georgia Railroad. It is difficult to perceive how the propinquity of the Postal will be more alarming. The case then is not one which justifies injunctive action against the proceeding in the state court.

The injunction sought, therefore, will be denied. It is moreover true that the Georgia Railroad is a post road, and in that sense at least is under the control of the judicial power of the United States. By virtue of the statutes before quoted, the telegraph company is not only bound to establish its lines as proposed, so as not to interfere with "ordinary travel," and in accordance with its amendments in the proceeding under the state laws, but it must in obedience to the statutes quoted maintain those lines. The Georgia Railroad is likewise obliged not to interfere with them. It follows that it is proper to maintain the bill for the purpose of compelling obedience to the promises and agreements the Postal has made, and the corresponding obligations of the Georgia. In case a final decree is not deemed appropriate at this time, the case will proceed as usual in equity.