ATLAS POWDER Co. *v.* GOODLOE, Secretary of State.

(*Nashville.* December Term, 1914.)

1. APPEAL AND ERROR. Review. Amendments. Issue with court.

The ruling by the chancellor denying a petition to amend a bill after a demurrer had been sustained, the complainant contending that the amendment was agreed to by the chancellor during the argument, cannot be reviewed; since the complainant cannot take issue with the chancellor in that manner as to what occurred during the argument. (*Post, p.* 499.)

Acts cited and construed: Acts 1909, ch. 504.

Constitution cited and construed: Sec. 8, art. 1.

2. TAXATION. Recovery of taxes paid. Payment under duress.

Payment under protest, reserving the right to sue for recovery, of the privilege tax required of foreign corporations by Acts 1909, ch. 504, the failure to pay which would have required the corporation's factory to remain idle, and would have rendered its contracts void, is made under duress, and not voluntarily. (*Post, pp.* 499-506.)

Acts cited and construed: Acts 1909, ch. 504.

Cases cited and approved: Gaar, Scott & Co. v. Shannon, 223 U. S., 468; Swift & C. & B. Co. v. United States, 111 U. S., 29; Robertson v. Frank Bros., 132 U. S., 23; Oceanic Steam Navigation Co. v. Stranahan, 214 U. S., 329; Arkansas Bldg. & Loan Ass'n v. Madden, 175 U. S., 269; Ex parte Young, 209 U. S., 123; Western Union Tel. Co. v. Andrews, 216 U. S., 165; Ludwig v. Western Union Tel. Co., 216 U. S., 146.

Case cited and disapproved: Railroad v. Marion County, 120 Tenn., 352.

Case cited and distinguished: Atchison, T. & S. F. R. Co. v. O'Conner, 223 U. S., 280.

Power Co. v. Goodloe.

3. **COMMERCE.** Regulation. Interstate commerce. State taxation.

The power of congress over interstate commerce is supreme, and the levying of taxes by a State which impedes or burdens such commerce is invalid. (*Post, p.* 506.)

Cases cited and approved: Galveston, H. & S. A. R. Co. v. Texas, 210 U. S., 217; Norfolk & Western R. R. v. Pa., 136 U. S., 114; Robbins v. Taxing Dist., 120 U. S., 489; Corson v. Maryland, 120 U. S., 502; Welton v. Mo., 91 U. S., 275; Brown v. Maryland, 12 Wheat., 419.

4. **CORPORATIONS.** Foreign corporations. Privilege tax.

The legislature has supreme control over foreign corporations in so far as it does not affect interstate commerce, and may exact such conditions and impose such taxes as it chooses on the privilege to do business within the State. (*Post, pp.* 506, 507.)

Cases cited and approved: Horn Silver Mining Co. v. N. Y., 143 U. S., 314; Mutual Life Ins. Co. v. Spratley, 172 U. S., 602; Hooper v. Cal., 155 U. S., 648; Bank of Augusta v. Earl, 39 U. S. (13 Pet.), 519; Paul v. Va., 75 U. S. (8 Wall.), 168; Pensacola Tel. Co. v. W. U. Tel. Co., 96 U. S., 1; Pembina Mining Co. v. Pa., 125 U. S., 180.

5. **COMMERCE.** Interstate commerce. Regulation. State tax. Privilege tax.

The fact that a corporation is engaged in interstate commerce does not exempt its property from a State tax, or preclude the State from imposing a privilege tax on its right to enter another State to do business, and the State may resort to the capital stock or receipts on property employed in interstate commerce to fix the value of such privilege tax, if the receipts and capital are not taxed as such. (*Post, p.* 507.)

Cases cited and approved: U. S. Exp. Co. v. Minn., 223 U. S., 335; Baltic Mining Co. v. Mass., 231 U. S., 83; Maine v. Grand Trunk Line, 142 U. S., 217; Provident Ins. Co. v. Mass., 6 Wall., 611; Flint v. Stone-Tracy Co., 220 U. S., 107.

6. COMMERCE. Constitutional law. Regulation. Due process of law. Privilege tax.

Acts 1909, ch. 504, which imposes on a foreign corporation entering the State to do business a privilege tax, measured by its authorized capital stock, is not, when applied to a foreign corporation principally engaged in the manufacture of powder, but which it sells in interstate commerce, and which has a factory and supply warehouse within the State, from which it fills orders for both interstate and intrastate shipments, invalid as imposing a burden on interstate commerce, contrary to Const., U. S., art. 1, sec. 8, giving congress the power to regulate interstate commerce or as taking the property of the corporation without due process of law, contrary to Const., U. S. Amend. 14, sec. 1. (*Post, pp.* 508-517.)

Acts cited and construed: Acts 1866, ch. 230.

Cases cited and approved: Western Union Telegraph Company v. Kansas, 216 U. S., 1; Pullman Co. v. Kansas, 216 U. S., 56; S. S. White Dental Co. v. Mass., 231 U. S., 68.

Cases cited and distinguished: Security Mutual Life Insurance Co v. Prewitt, 202 U. S., 246; Baltic Mining Company v. Mass., 231 U. S., 78.

---

FROM DAVIDSON.

---

Appeal from the Chancery Court of Davidson County.—JOHN ALLISON, Chancellor.

HENRY S. STOKES, for appellant.

FRANK M. THOMPSON, attorney-general, for appellee.

MR. JUSTICE FANCHER delivered the opinion of the Court.

The bill in this case was filed February 14, 1913, to recover of defendant, as secretary of State, the sum of $1,500, paid by complainant to the secretary of State under and in accordance with chapter 504 of the Acts of 1909, which statute declares the coming into this State of any corporation, association, or joint-stock company chartered or incorporated under the laws of another State or country for the doing of business here a privilege, and exacts of every such corporation the payment of a tax upon its authorized capital stock.

Complainant is a foreign corporation, organized under the laws of the State of Delaware, with its main office in the city of Wilmington, Del. It averred that it was engaged in the business of manufacturing and selling powder, dynamite, and other explosives; that it has plants for the manufacture of dynamite located at Hopatcong, N. J., Center, Mich., Atlas, Mo., Vigorit, Cal., and plants for the manufacture of blasting powder at Riker, Pa., Shenandoah, Pa., Ooltewah, Tenn., Belleville, Ill., Pittsburg, Kan., and Patterson, Okl.; that it had a large number of storage or distributing magazines located in Arkansas, Kentucky, California, Illinois, Kansas, Maine, Missouri, Michigan, New Jersey, Oklahoma, Pennsylvania, Tennessee, and Texas; that it maintained general sales offices at Phlidelphia, Pa., Houghton, Mich., Joplin and St. Louis, Mo., and Nashville, Tenn.; and that the home office at Wilmington, Del., had general supervision over the sales. Complainant further averred

that the authorized capital stock of the Atlas Powder Company is $5,000,000, $3,000,000 of which has been issued, and that it has storage magazines located near Bristol, Chattanooga, Jellico, Johnson City, Knoxville, Memphis, and Nashville, in which were stored dynamite, black powder, and blasting supplies from which a portion of the company's trade in Tennessee and surrounding States is supplied; that all orders which involve car load lots of dynamite are supplied from factories operated by the company and located outside of Tennessee, the less than car load lot orders received from points in Tennessee being filled partly from storage magazines in Tennessee and partly from magazines in Kentucky; that orders for certain car load lots of black powder and less than car load lots of both black powder and dynamite emanating from points in States bordering on Tennessee are filled from the black powder factory at Ooltewah, Tenn., and from the magazines of the company located in other points in Tennessee; that all collections are made from the company's office in Wilmington, Del., with the exception of a small amount of cash sales. Complainant further averred that at the time the company commenced business in the State of Tennessee the proportion of its capital stock employed therein, represented by its property, consisting of a black powder factory at Ooltewah and magazines and magazine equipment at the above-mentioned points, including raw material at the said plant and the finished product at the plant and magazines, amounted to $305,945.11,

Power Co. v. Goodloe.

while the entire assets of the company, located except as above indicated and outside of the State of Tennessee, amounted to $6,000,000; that a very large proportion of the business conducted and carried on at the Nashville office consists of strictly interstate commerce, and that this office is maintained quite as much for the purpose of handling this interstate commerce as for the carrying on of business within the State; that no discimination, distinction, or apportionment is made between the orders originating in Tennessee, filed at the Nashville office, and other transactions passing through that office; that such domestic transactions are carried on merely as incidental and auxiliary to the more strictly interstate business of complainant, and are so closely interwoven and connected with such interstate portion of complainant's business that such domestic business could not be given up or abandoned without imposing an additional burden upon, or without serious detriment to, the strictly interstate commerce portion of complainant's business; that complainant, on the 28th day of January, 1913, applied to the secretary of State of Tennessee for admission to the State as a foreign corporation to do intrastate business in Tennessee, and that complainant tendered to the secretary of State a duly certified copy of its certificate of incorporation, together with the filing fee of $20 required under the law of this State, and asked for a certificate of authority to do business in Tennessee; that the secretary of State declined to issue this certificate, and refused to accept said filing

fee or the copy of the certificate of incorporation until complainant should pay the additional sum of $1,500, being the alleged amount of an entrance tax under and in accordance with chapter 504 of the Acts of 1909; that thereupon complainant protested, and insisted that said demand of payment was illegal and wrongful, and that said law was unconstitutional, and yet, to prevent a heavy loss to its business, it paid to the secretary of State the required sum of $1,500, said payment being made under protest, and reserving the right to sue to recover the same, and to have said law declared unconstitutional, and was so received by the secretary of State on January 28, 1913, under protest of complainant. Thereupon said certificate of authority was issued.

Complainant charged that Acts 1909, ch. 504, was unconstitutional and void; that under the classification of this act complainant upon its capital stock, which is in excess of $5,000,000, was taxed, and wrongfully forced to pay, the sum of $1,500; that said act arbitrarily fixes the entrance fee of a foreign corporation upon the amount of its capital stock without any reference to the amount or extent of its business, intrastate or interstate; that the imposition of this tax is a hindrance to its interstate business; that this act lays a burden upon interstate commerce, and is therefore in conflict with article 1, section 8, of the constitution of the United States; that this statute imposes a tax upon complainant's capital stock representing property outside the State of Tennessee, and thereby

deprives complainant of property without due process of law, and in conflict with the fourteenth amendment to the constitution of the United States; that the principal function of complainant's business is interstate commerce; and that it was engaged in intrastate commerce only as incidental or auxiliary thereto.

Defendant demurred to the bill as follows:

First, that the bill shows that the fees or taxes required by the State of Tennessee as a condition precedent to the admission of complainant to do business in this State were paid by complainant voluntarily, and not under duress in fact or law, so that complainant has no right to recover said fees or taxes.

Second, Acts 1909, ch. 504, pursuant to the provisions of which complainant paid to defendant the fees or taxes referred to in the bill, is a valid and constitutional statute of this State, enacted according to her lawful and constitutional authority to impose upon foreign corporations conditions for their admission to do business in the State, and is not in contravention of the federal constitution in any of the particulars alleged in the bill.

Third, the bill shows that complainant is principally engaged in the manufacture of powder, and the principal business for which it sought and received admission to do business in Tennessee was and is the manufacture of powder, which is not in any sense "commerce," and the fees named in said Acts 1909, ch. 504, as a condition precedent to complainant's carrying on its said business in this State, do not infringe any

131 Tenn. 32

legal right of complainant, and were enacted by the general assembly of the State of Tennessee under its lawful and constitutional authority.

The chancellor sustained the demurrer and dismissed the bill.

Upon the argument of the case counsel for complainant asked leave of the court to so amend the bill by filing as exhibit A thereto a copy of the original receipt executed by the secretary of State, showing that the payment was made under protest and without waiver of any rights of the Atlas Powder Company to seek to have the act under which said payment was exacted declared unconstitutional. Said amendment was made.

At the conclusion of the argument of the attorney general, complainant made application to further amend the bill by filing as Exhibit B thereto a copy of the decree of the district court of the United States for the district of Delaware, which amendment was also allowed.

This decree adjudged that a combination existed among certain defendants in restraint of interstate commerce in powder and other explosives, and had monopolized a part of such commerce, and enjoined the continuance of said combination and monopoly, and that same be dissolved, and provided that certain plants owned by the various defendants therein, including the plant at Ooltewah, Tenn., be transferred to a corporation to be organized for that purpose, and other plants were to be transferred to other concerns

in order to dissolve the combination. It appears that, in pursuance of this federal decree, the plant at Ooltewah was transferred to the Atlas Powder Company.

After the chancellor had rendered his decree in the present case, complainant made application through a petition for further amendment to its original bill, undertaking to set up the fact that such amendment was agreed to be permitted by the court pending the argument, but the application to file this petition was denied by the chancellor because it was an effort to make an issue with the court as to what occurred on the argument and hearing of the demurrer, and because it was irrelevant and attempted to set out argument of counsel on the demurrer.

Complainant excepted to this action of the chancellor, and incorporated his petition in a bill of exceptions.

The first assignment of error complains of the refusal of the chancellor to permit this aditional amendment. It is not proper for this court to interfere with the ruling of the chancellor in this regard, because complainant cannot, after a decree has been entered, make an issue with the court as to what occurred pending the trial, by a petition of this nature. Complainant should have presented in proper form the amendment it desired at the proper time. If this had been done, no dispute could have arisen as to what the amendment should include.

The second assignment of error is that the chancellor erred in sustaining the first ground of defend-

ant's demurrer; this ground of demurrer making the point that the fees or taxes were not paid under duress, but voluntarily.

It has been held by this court that, before it can hold a payment of taxes involuntary, it must appear that the officer had in his hand process authorizing the seizure of the person or property of the taxpayer; that such seizure of one or the other was imminent, and that there was no other legal means of protecting the person or property than by payment; that under such circumstances payment under protest will save the rights of the taxpayer to recover if the tax should be illegal; that mere protest or unwillingness is not sufficient. *Railroad* v. *Marion County,* 120 Tenn., 352, 108 S. W. 1058.

Complainant insists, however, that the payment under the conditions herein named constituted payment under duress. Relying upon a number of authorities, perhaps the cases most applicable to the present state of facts cited by complainant in support of this proposition are *Gaar, Scott & Co.* v. *Shannon,* 223 U. S., 468, 32 Sup. Ct., 236, 56 L. Ed., 510; *Atchison, etc., Ry. Co.* v. *O'Connor,* 223 U. S., 280, 32 Sup. Ct., 216, 56 L. Ed., 436, Ann. Cas., 1913C, 1050.

In the first-mentioned case the secretary of State was sued for the recovery of taxes paid under protest by the plaintiff, Gaar, Scott & Co. A statute had been passed by the Texas legislature providing for a franchise tax and for foreifture of the right of a foreign corporation to do business in the State if the tax was

not paid by a certain date. The company alleged in its petition that before the time limit for the payment of the franchise tax expired, and under duress of the statute, it paid the tax demanded, under protest, and with written notice that it reserved the right to sue for the recovery of the amount exacted by an unconstitutional law. The point was made by the secretary of State that this payment was voluntary. Upon this point Justice Lamur, speaking for the court, said:

"Neither a statute imposing a tax, nor the execution thereunder, nor a mere demand for payment, is treated as duress. It does not necessarily follow that there will be a duress of goods. Or, if there is, the citizen, to avoid the consequences of the duress, may pay the money, regain the use of his property, and maintain a suit for the recovery of what has been exacted from him. The legal remedy redresses the wrong. But he has the same right to sue if he pays under compulsion of a statute whose selfexecuting provisions amount to duress. An act which declares that, where the franchise tax is not paid by a given date, a penalty of 25 per cent. shall be incurred, the license of the company shall be canceled, and the right to sue shall be lost, operates must more as duress than a levy on a limited amount of property. Payment to avoid such consequences is not voluntary, but compulsory, and may be recovered back. *Swift & C. & B. Co.* v. *United States,* 111 U. S., 29, 4 Sup. Ct., 244, 28 L. Ed., 343; *Robertson* v. *Frank Bros.,* 132 U. S., 23, 10 Sup. Ct., 5, 33 L. Ed., 238; *Oceanic Steam Navigation Co.* v. *Stranahan,* 214

U. S., 329, 29 Sup. Ct., 671, 53 L. Ed., 1018; *Atchison,*
*T. & S. F. R. Co.* v. *O'Connor* [223 U. S., 280, 32 Sup.
Ct., 216, 56 L. Ed., 436, Ann. Cas., 1913C 1050], de-
cided this day . . . Otherwise plaintiff might be
without any remedy whatever; for in *Arkansas Bldg.*
*& Loan Ass'n* v. *Madden,* 175 U. S., 269, 20 Sup. Ct.,
119, 44 L. Ed., 159, it was held that the taxpayer was
not entitled to an injunction against the enforcement
of a similar statute of the State of Texas, unless he
could show that there was no adequate remedy at
law.''

In the case of *Atchison, T. & S. F. R. Co.* v. *O'Con-*
*nor,* 223 U. S., 280, 32 Sup. Ct., 216, 56 L. Ed., 436,
Ann. Cas., 1913C, 1050, the plaintiff sued to recover
taxes paid under duress and protest. The defendant
demurred that the payment. was voluntary. In this
case Justice Holmes speaking for the court said:

''It is reasonable that a man who denies the legality
of a tax should have a clear and certain remedy. The
rule being established that, apart from special circum-
stances, he cannot interfere by injunction with the
State's collection of its revenues, an action at law to
recover back what he has paid is the alternative left.
Of course we are speaking of those cases where the
State is not put to an action if the citizen refuses to
pay. In these latter he can interpose his objections by
way of defense; but when, as is common, the State has
a more summary remedy; such as distress, and the
party indicates by protest that he is yielding to what
he cannot prevent, courts sometimes perhaps have

been slow to recognize the implied duress under which payment is made. But even if the State is driven to an action, if at the same time the citizen is put at a serious disadvantage in the assertion of his legal, in this case of his constitutional, rights, by defense in the suit, jutsice may require that he should be at liberty to avoid . . . bringing suit on his side. He is entitled to assert his supposed right on reasonably equal terms. See *Ex parte Young,* 209 U. S., 123, 146, 28 Sup. Ct., 441, 52 L. Ed., 714, 723, 13 L. R. A. (N. S.), 932, 14 Ann. Cas., 764. If he should seek an injunction on the principle of that case and of *Western Union Tel. Company* v. *Andrews,* 216 U. S., 165, 30 Sup. Ct., 286, 54 L. Ed., 430, he would run the same risk as if he waited to be sued. . . . It may be that the forfeiture of the right to do business would not be authoritatively established except by a *quo warranto* provided for in a following section, but before or without the proceeding the effect of the forfeiture clause upon the plaintiff's subsequent contracts and business might be serious (see *Ludwig* v. *Western U. Tel. Co.,* 216 U. S., 146, 30 Sup. Ct., 280, 54 L. Ed., 423), and in any event the penalty would go on accruing during all the time that might be spent before the validity of the defense could be adjudged. As appears from the decision below, the plaintiff could have had no certainty of ultimate success, and we are of opinion that it was not called upon to take the risk of having its contracts disputed and its business injured and of finding the tax more or less nearly doubled in case it finally had to

pay; in other words, we are of opinion that the payment was made under duress.''

We are inclined to the view that the corporation in this case can make the question of the right of the State to exclude it without first proceeding to undertake business in defiance of the statute, and waiting for the State to bring proceedings in the nature of *quo warranto* against it, calling upon it to show cause by what authority it attempts to do business in Tennessee. Such a course of action by complainant would be a flagrant disregard of the statute and a defiance of the authority of the State, and would also subject all its contracts within the State to attack, and render them illegal and void. Being in the attitude of either paying the tax or rendering its contracts void, we believe there was such duress under the authority of *Gaar, Scott & Co.* v. *Shannon,* and *Atchison, etc., R. R. Co.* v. *O'Connor,* supra, that its payment of the tax was not voluntary. Complainant would have its right of *mandamus,* it is true, but in the meantime its factory in Tennessee would necessarily have to remain idle, and its other properties in the State could not be utilized. Its business would be greatly crippled and hindered, thereby entailing financial loss, while its rights were being litigated in the courts.

It occurs to us that to thus require it to go through the various courts necessary to finally test the law and meanwhile compel its properties to stand in idleness and suffer loss would be even greater duress than the levying of a distress warrant or other process against its property by the State to collect the tax.

It would seem to be more reasonable to allow it to pay the tax under protest and then sue to recover back, as it has done, than to require it to suffer the loss indicated.

The case of *Railroad* v. *Marion County* is not in point. In that case there was no impending loss to the taxpayer until the officers for the collection of the taxes took action to collect by process of law and the property about to be seized or sold for payment of the tax. We therefore hold that the complainant may test its rights in the present suit, and we proceed to consider the merits of the litigation.

The third and fourth assignments of error raise the important questions in the lawsuit. These questions are: Can the State enforce a tax under the circumstances here presented? or will such tax be a burden upon interstate commerce? In other words, does the Act of 1909, ch. 504, infringe upon the commerce clause of the constitution, and to give it any effect in cases like this would property be taken without due process of law in violation of the fourteenth amendment to the federal constitution?

The power of congress over interstate commerce is supreme under the federal constitution. It is well settled that the levying of taxes by a State which will impede, interfere, or burden such commerce between the states, is invalid. *Galvston, H. & S. A. R. Co.* v. *Texas,* 210 U. S., 217, 28 Sup. Ct., 638, 52 L. Ed., 1031; *Norfolk & Western R. R.* v. *Pa.,* 136 U. S. 114, 10 Sup. Ct., 958, 34 L. Ed., 394, 396; *Robbins* v. *Taxing Dist.,*

120 U. S., 489, 7 Sup. Ct., 592, 30 L. Ed., 694; *Corson* v. *Maryland,* 120 U. S., 502, 7 Sup. Ct., 655, 30 L. Ed., 699; *Welton* v. *Mo.,* 91 U. S., 275, 23 L. Ed., 347; *Brown* v. *Maryland* 12 Wheat., 419, 6 L. Ed., 678.

It is equally well settled that, where the imposition of a tax by a State does not burden or affect interstate commerce, the control of the legislature over foreign corporations is supreme. A State may exact such conditions against a foreign corporation as it may deem suitable to the public interest or policy as a prerequisite to its admission within the State. It may exact the payment of a specific sum to the State each year. It may exclude a foreign corporation entirely, or restrict its business to particular localities, or may exact such security for the performance of its contracts with its citizens as is deemed best to promote the public interest.

In one case the supreme court of the United States upon this subject said:

"The recognition of its existence even by other States, and the enforcement of its contracts made therein, depend purely upon the comity of those States —a comity which is never extended where the existence of a corporation or the exercise of its powers is prejudicial to their interests or repugnant to their policies. Having no absolute right of recognition in other States, but depending for such recognition and the enforcement of its contracts upon their assent, it follows, as a matter of course, that such assent may be granted upon such terms and conditions as those

States may think proper to impose." *Horn Silver Mining Co.* v. *N. Y.*, 143 U. S., 314, 12 Sup. Ct., 404, 36 L. Ed., 167; *Mutual Life Ins. Company* v. *Spratley,* 172 U. S., 602, 19 Sup. Ct., 308, 43 L. Ed., 570; *Hooper* v. *Cal.,* 155 U. S., 648, 15 Sup. Ct., 207, 39 L. Ed. 297; *Bank of Augusta* v. *Earl,* 39 U. S. (13 Pet.), 519, 10 L. Ed., 274; *Paul* v. *Va.,* 75 U. S. (8 Wall.), 168, 19 L. Ed., 357; *Pensacola Tel. Co.* v. *W. U. Tel. Co.,* 96 U. S., 1, 24 L. Ed., 708; *Pembina Mining Co.* v. *Pa,.* 125 U. S., 180, 8 Sup. Ct., 737, 31 L. Ed., 650.

It is equally true that the mere fact that a corporation is engaged in interstate commerce does not exempt its property from State taxation nor preclude the State from fixing a privilege tax or entrance fee upon its right to enter a foreign State and transact business. *U. S. Exp. Co.* v. *Minn.,* 223 U. S. 335, 32 Sup. Ct., 211, 56 L. Ed., 459; *Baltic Mining Co.* v. *Mass.,* 231 U. S., 83, 34 Sup. Ct., 15, 58 L. Ed., 133.

Furthermore, a resort to the receipts on the property or capital employed by such foreign corporation when such receipts or capital are not taxed as such, but are taken as a mere measure of a tax, which is of lawful authority within the State, has likewise been sustained by the supreme court of the United States. *Maine* v. *Grand Trunk Line,* 142 U. S., 217, 12 Sup. Ct., 121, 35 L. Ed., 994; *Provident Ins. Co.* v. *Mass.,* 6 Wall., 611, 18 L. Ed., 907; *Flint* v. *Stone-Tracy Co.,* 220 U. S., 107, 162, 165, 31 Sup. Ct., 342, 55 L. Ed., 389, 417, 419, Ann. Cas., 1913B, 1312; *Horn Silver Mining Co.* v. *N. Y.,* supra.

The difficulty along these lines occurs when a corporation is engaged partly in interstate commerce, but with a portion of its business local or intrastate. In cases where the corporation in question has a mixed business of this nature, it sometimes becomes very difficult to determine just where the power of a State in this respect stops. The supreme court of the United States itself has had great difficulty along these lines, and often that court has been very much divided in opinion where the corporation in question did largely an interstate commerce business.

Two opinions relied upon by the complainant in the present case as sustaining its position that the statute here in question is violative of the commerce reservation of authority contained in the federal constitution, and also in violation of the due process clause of said constitution, were rendered by the supreme court of the United States in the cases of *Western Union Telegraph Company* v. *Kansas,* 216 U. S., 1, 30 Sup. Ct., 190, 54 L. Ed., 355, and *Pullman Co.* v. *Kansas,* 216 U. S., 56, 30 Sup. Ct., 232, 54 L. Ed., 378.

The Kansas statute in question in these cases required a foreign corporation to file irrevocable written consent that actions might be brought against it in the State court by service on the secretary of State; that it should pay $25 application fee as a prerequisite to its application to be granted permission by the charter board to enter the State, and, when this permission was granted, it should then file a copy of its charter, or, if then doing business within the State, to file such

charter within thirty days from the taking effect of the act. It should also pay to the State treasurer before filing the charter, for the benefit of the permanent school fund, a charter fee of one-tenth of one per cent. of the first $100,000 of capital stock, and for each million or major part thereof above $500,000 should pay $200. Permission was granted by the charter board to the Western Union Telegraph Company to continue to do business in the State subject to the payment of $20,100, being the charter tax on its $100,000,000 of capital stock; but this was not to restrict in any way the doing of inter-state business or business for the federal government, but was to relate to business transacted wholly within the State of Kansas. The company refused to pay this fee, and continued as before to do business in Kansas. Ouster proceedings were thereupon brought by the State. The defendant company said it had been doing business in Kansas since it was a territory, and had 800 or 900 offices, and had been invited to come there and do domestic and interstate business; that it was an instrument of interstate commerce and an agency of the United States under an Act Cong. July 24, 1866, ch. 230, 14 Stat. 221 (U. S. Comp. St. 1913, sections 10072-10077), which was an act to aid in the construction of telegraph lines and to secure to the government the use of same for postal, military, and other purposes; that its lines were constructed in Kansas under authority of the secretary of the treasury and under the authority of certain acts of congress; and that it could not now be excluded from the

State. It averred that its receipts from interstate and government business alone would in many instances not be sufficient to keep the offices open, and that the closing of them would be detrimental to the government service, as well as to interstate commerce; that the charter board attempts to collect a charter fee based upon defendant's entire capitalization. namely, $100,000,000, consisting of property in forty-five States of the Union, as well as in Kansas, and upon the Atlantic and Pacific Oceans and foreign countries; that such a tax was on property outside of Kansas.

In the case of *Pullman Co. v. Kansas,* supra, the *Pullman Palace Car Company* had in operation in the State of Kansas a number of cars which were used not only in intrastate business, but also in interstate business. It was claimed on behalf of both these companies that their business and facilities for doing business were so intermixed that a tax upon the company was necessarily a burden upon interstate business, and it was so held by a majority of the court. One opinion was by Mr. Justice Harlan and another by Mr. Justice White in favor of the majority view. A dissenting opinion was delivered by Mr. Justice Holmes, concurred in by the Chief Justice, and also by Mr. Justice McKenna, and it was said that the late Mr. Justice Peckham took part in the consideration and agreed with the minority. Mr. Justice Holmes in his dissenting opinion in the *Pullman Company Case* accuses the court of abandoning its latest decision in the case of *Security Mutual Life Insurance Co. v. Prewitt,* 202 U.

S., 246, 26 Sup. Ct., 619, 50 L. Ed., 1013, 6 Ann. Cas., 317, and he aptly says:

"I am quite unable to believe that an otherwise lawful exclusion from doing business within a State becomes an unlawful or unconstitutional burden on commerce among States because if it were let in it would help to pay the bills. Such an exclusion is not a burden on foreign commerce at all; it simply is a denial of a collateral benefit. If foreign commerce does not pay its way by itself, I see no right to an entrance for domestic business to help it out."

It will be observed that in the two cases last mentioned each of those corporations was primarily engaged in interstate commerce. The telegraph company used the same offices and the same operators in sending interstate messages and intrastate messages, and it was a public service corporation, no doubt doing largely an interstate business. In the case of the Pullman Palace Car Company the same employees and cars were used in carrying passengers from one State to another that were used for the same purposes within the State.

A more recent opinion by the supreme court of the United States, and one which, we think, is much more in point with the present case than either of the cases mentioned above, is that of *Baltic Mining Company* v. *Mass.,* supra, and *S. S. White Dental Co.* v. *Mass.,* 231 U. S., 68, 34 Sup. Ct., 15, 58 L. Ed., 127. The opinion in these two cases was delivered to Mr. Justice Day, who was with the majority in the Kansas cases.

The Baltic Mining Company was a Michigan cor-
poration owning a copper mine and equipment in
Michigan. Its principal place of business was in that
State. It had an office in Boston, Mass., for the use of
its president and treasurer, residing in Boston, and
for the general financial management and direction of
its affairs, where its board of directors met and cer-
tificates of stock were transferred, etc. The Copper
Range & Consolidated Company, a New Jersey cor-
poration, owned and held most of its shares of stock,
and had an office and place of business in Boston. The
Baltic Mining Company was admitted to do business
in Massachusetts, and complied with the foreign cor-
poration laws of that State. Its capital stock was
$2,500,000, and its assets were $10,776,000. None of
its property was in Massachusetts except its current
bank deposits and $80,000 of certificates of stock in
another Michigan corporation. It was engaged in
mining and refining copper which was sold for
delivery in the several States and in foreign countries.
The United Metals Selling Company, a New Jersey
corporation, with its principal business in New York,
did the business of selling the products of the Baltic
Mining Company. Considerable quantities of copper
were sold for delivery in Massachusetts as well as
other States, and transported to the purchaser. In ex-
ceptional cases sales were made in Massachusetts for
delivery there, but this was out of the usual course of
business; not more than five per cent. of the total sales
being made in Massachusetts. The larger part of its

sales were consummated in New York. The case was a suit to recover $500 paid as an excise tax.

The S. S. White Dental Mfg. Company was a Pennsylvania corporation manufacturing, buying, and selling dental supplies. Its capital stock was $1,000,000, with assets of $5,711,718.29. It had a place of business in Boston, consisting of large salesrooms, stockrooms, offices, and storerooms. Books were kept there, and a New England sales agent was in charge, with fifty-four persons employed; twelve of that number being salesmen who traveled through New England. No manufacturing was done in Massachusetts. Goods were sold over the counter in the Boston store and for delivery in Massachusetts by messenger, mail, and express. Fifty per cent. of the sales in that store were to residents of Massachusetts, and fifty per cent. for delivery to persons outside the State, billed by the company direct to the purchaser as consignor and consignee, respectively. Orders were also accepted at the Boston storerooms for delivery from New York and Pennsylvania factories, being billed direct to the purchaser from the factory. The property of this concern in Massachusetts was about $100,000. It had fourteen places of business other than those in Massachusetts and Pennsylvania, which were located in New York and other States. Ten per cent. of its sales were made in Massachusetts; one-half being for delivery in that State. This company also complied with the law relating to foreign corporations, and sought to recover an excise tax of $200. The excise tax required of each

131 Tenn. 33

of these two corporations was one which was collectible when the corporation filed its annual certificate of condition. A failure to pay the tax subjected the corporations to penalties and injunction until it was paid. The plaintiffs in these cases sought to recover on the ground that the tax required of them was a burden on that portion of the business and capital devoted to interstate commerce.

In the Baltic Mining Company case the court, after stating the powers of congress over interstate commerce, and the right of a State to tax a corporation, though it be engaged in interstate commerce, so long as the commerce itself is not burdened by State exactions which interfere with the exclusive federal authority over it, of the right to prescribe the conditions upon which a foreign corporation may do business within the State, that a resort to the receipts or capital employed in part at least in interstate commerce, when not taxed as such, may be taken as a measure of the tax imposed, then proceeds to state the facts upon which the cases of *Western Union Telegraph Company* v. *Kansas and Pullman Company* v. *Kansas* were decided. The court thereupon points out that the business of these companies was commerce; the same instrumentalities and agencies carrying on in the same places the business of State and interstate character, with no separation of the intrastate business from the interstate business by the limitations of State lines in its prosecution. The court then says:

''An examination of the previous decisions in this court shows that they have been decided upon the application to the facts of each case of the principles which we have undertaken to state, and a tax has only been invalidated where its necessary effect was to burden interstate commerce or to tax property beyond the jurisdiction of the State. In the cases at bar the business for which the companies are chartered is not of itself commerce. True it is that their products are sold and shipped in interstate commerce, and to that extent they are engaged in the business of carrying on interstate commerce, and are entitled to the protection of the federal constitution against laws burdening commerce of that character. Interstate commerce of all kinds is within the protection of the constitution of the United States, and it is not within the authority of a State to tax it by burdens and laws. From the statement of facts it is apparent, however, that each of the corporations in question is carrying on a purely local and domestic business quite separate from its interstate transactions. That local and domestic business, for the privilege of doing which the State has imposed the tax, is real and substantial, and not so connected with interstate commerce as to render a tax upon it a burden upon the interstate business of the companies involved.'' *Baltic Mining Company* v. *Mass.*, 231 U. S., 78-86, 34 Sup. Ct., 19, 58 L. Ed., 127.

The tax imposed by Massachusetts involved in the Baltic Mining Company and S. S. White Dental Company Cases was an excise tax to be paid annually, and

therefore somewhat different from the tax here in question, which is a tax upon the right to enter the State and do business within the State; yet the same principles apply. The tax in each is graduated according to capital stock, whether that stock be employed in part in interstate commerce or not.

The present case must be determined upon its own facts. There is a strong similarity in facts here to the business of the Baltic Company and the Dental Company. All are engaged to a large extent in interstate commerce, but they are each primarily manufacturing corporations, and engaged in selling their own products upon the market. In those two federal cases neither company owned a factory in Massachusetts, but each had local storehouses where local sales were made. They could have omitted the local business if they saw proper, and thus separated the local business from the interstate commerce. This was entirely optionary, as it is in the case at bar. A sharp distinction exists in the Pullman Company and the Western Union Telegraph Company cases, in that those concerns were public service corporations and were bound to accept local business.

One important feature in the case at bar is that it is engaged in manufacturing black gunpowder at its factory at Ooltewah, in this State, and it also has six storage magazines where explosives are kept. It also has its places in this State in a number of cities where local sales are made. It occurs to us that any part of this local business is of such character as to render

Power Co. v. Goodloe.

the complainant liable to the payment of this charter tax, or tax on its right to enter the State to do intrastate business. Certainly the manufacturing business in this State and the operation of storage magazines are so far separated from the interstate sales of explosives that there can be but little difficulty in the conclusion that the right of the state to impose this tax is clear, and we so hold.

Many authorities are cited in briefs, but those herein mentioned are conclusive, though we have not attempted to state authorities in full on the subject. We have been content to refer only to such federal opinions as served to illustrate the subjects under discussion. Other cases bear out the conclusion reached.

Decree of chancellor affirmed.