SOUTH PORTO RICO SUGAR COMPANY, PLAINTIFF AND APPEL-
LANT, v. TREASURER OF PORTO RICO, DEFENDANT AND AP-
PELLEE.

APPEAL from the District Court of San Juan, Section 1, in
an Action for the Refund of Taxes Paid Under Protest.

No. 1827.—Decided June 29, 1918.

TAXES PAID UNDER PROTEST—VOLUNTARY PAYMENT—THREAT OF SEIZURE.—The
rule is firmly established that taxes paid voluntarily cannot be recovered,
and payments made with knowledge and without compulsion are voluntary;
but where a corporation is required to make a complete report of its assets
and is threatened with seizure of its property under a complete and unmis-
takable system of collection of taxes, it is doubtful that a payment then
made is voluntary.

ID.—ID.—COLLECTION OF TAXES—STEPS TO COLLECT.—The disjunctive used in
section 1 of the act of 1911 militates against the theory that in saying "shall
institute any proceeding or take any steps" the Legislature was associat-
ing a slightly different form of the same concept. "To collect" frequently
means a measure outside of courts. "To take any steps" is a most general
way of expressing any kind of action to collect. "To take steps" means to
take action, to move in the matter.

ID.—ID.—ATTEMPT TO COLLECT TAXES ILLEGALLY—REMEDY.—The act of 1911
abolishes all remedies in case of the collection of, or attempt to collect,
revenue illegally other than that provided in the act itself, and a threat
to seize property if the taxes are not paid is an attempt to collect; there-
fore if the person threatened conceive the taxes exacted to be unjust or
illegal, his only recourse is to pay the amount under protest and sue the
Treasurer for its recovery.

ID.—ID.—PARTIES—ASSIGNEE.—Taxes were assessed against two other corpora-
tions and the appellant, the present owner of the properties sought to be
taxed, paid the taxes as the assignee of the other corporation. It was main-
tained by the appellee that the appellant was not the proper person to sue
for the recovery of these taxes and held by the court that the objection was
without merit.

The facts are stated in the opinion.
*Mr. O. B. Frazer* for the appellant.
*Hon. Howard L. Kern,* Attorney General, for the appellee.
MR. JUSTICE WOLF delivered the opinion of the court.
This is a tax case on appeal from a judgment on demurrer

decided in favor of the Government, the defendant in the court below.

Appellant is a corporation required by law to furnish the Treasurer the details of its assets and business from which the Treasurer or his agents make up the assessment, details which the appellant furnished in this case. The taxes so as-sessed, assuming that they were legal, became due and payable by various sections of the Political Code, among them section 331, which makes it the duty of the taxpayer, without demand, to attend at the office of a collector and pay his taxes. After the taxes were payable and within a period next imme-diately before the property of the appellant was subject to attachment, the Treasurer of Porto Rico, the nominal appel-lee, on August 25, 1917, wrote a letter to appellant in which he demanded the payment of taxes and threatened to attach its property if said taxes were not paid by August 30, 1917.

The appellant thereupon paid its taxes under protest within the period when the property was not subject to at-tachment, and it claims the benefit of the Law of March 9, 1911. The Government maintains that the payment made under these conditions is purely voluntary and that the ap-pellant cannot recover.

Mr. Chief Justice Fuller in *Cheseborough* v. *United States,* 92 U. S. 259, said: "The rule is firmly established that taxes voluntarily paid cannot be recovered back and payments with knowledge and without compulsion are voluntary." In *Guerra* v. *Treasurer,* 8 P. R. R. 280 (1905), this court held that a payment of taxes without duress prevented a recovery. On page 305 of the opinion the reasons for the rule are given by citations from Cooley on Taxation. The theory was, following the common-law rule, that a mistake of law in a payment would leave the person who paid without a remedy. The decision in the *Guerra* case was made on the assumption, without discussion, that the common-law rule was applicable in Porto Rico, and without any consideration of section 1796

of the Civil Code, a matter which we reviewed in *Arandes* v. *Báez,* 20 P. R. R. 371. Again, in *American R. R. Co.* v. *Wolkers,* 22 P. R. R. 268, we considered to some extent what was the nature of the quasi contract of *solutio indebiti.*

Assuming, however, that by the adoption of the American taxation statute the common law came into force in Porto Rico in this regard, we still question whether the payment in this case was voluntary. The first and *leading* case relied upon by the Attorney General and cited by Mr. Chief Justice Fuller, *supra,* is *Railroad Company* v. *Commissioner,* 98 U. S. 541. There the court said:

"The real question in this case is whether there was such an immediate and urgent necessity for the payment of the taxes in controversy as to imply that it was made upon compulsion. The treasurer had a warrant in his hands which would have authorized him to seize the goods of the company to enforce the collection. This warrant was in the nature of an execution running against the property of the parties charged with taxes upon the lists it accompanied, and no opportunity had been afforded the parties of obtaining a judicial decision of the question of their ability. As to this class of cases, Mr. Chief Justice Shaw states the rule in *Preston* v. *Boston* (12 Pick. [Mass.] 14), as follows: 'When, therefore, a party not liable to taxation is called upon peremptorily to pay upon such a warrant, and he can save himself and his property in no other way than by paying the illegal demand, he may give notice that he so pays it by duress and not voluntarily, and by showing that he is not liable, recover it back as money had and received.' This, we think, is the true rule, but it falls far short of what is required in this case. No attempt had been made by the treasurer to serve his warrant. He had not even personally demanded the taxes from the company, and certainly nothing had been done from which his intent could be inferred to use the legal process he held to enforce the collection, if the alleged illegality of the claim was made known to him. All that appears is, that the company was charged upon the tax-lists with taxes upon its real and personal property in the county. After all the taxes had become delinquent under the law, but before any active steps whatever had been taken to enforce their collection, the company presented itself at the treasurer's office, and in the usual course of business paid in full everything that was charged against it, accompanying

the payment, however, with a general protest against the legality of the charges and a notice that suit would be commenced to recover back the full amount that was paid. No specification of alleged illegality was made, and no particular property designated as wrongfully included in the assessment of the taxes.''

Where a corporation is bound to make a complete return of its assets and is threatened on the morrow with an attachment under a complete and unmistakable system of collection of taxes, we may doubt whether a payment so made is voluntary. The elaborateness and pains at which the Treasurer had been to make up his schedules were bound to convince anyone that a threat of attachment would be followed up almost inevitably, and that payment was the only way of avoiding costs and complications or even perhaps an interruption of business.

The appellant in the instant case paid his taxes on the very last day possible before the right of attachment in favor of the Government began to run. We cannot hold that it was necessary for the appellant to run a race of diligence with the Treasurer on the day the property became attachable.

In the brief of the Attorney General it is suggested, rather than clearly asserted, that the Supreme Court of Tennessee has decided that the payment of taxes under the conditions of this case would not fall within the Tennessee statute of 1873, our statutes, or some of the principal parts thereof, being taken from Tennessee.

We find no decision in Tennessee which considers any statute like the one we have before us; in other words, whether a payment thus made would fall outside of the provision of the statute of that State of 1873. *Power Co.* v. *Goodloe;* 131 Tenn. 490, is perhaps the closest case. There some $1,500 was demanded from a foreign corporation as a privilege tax to do business in the State. This form of taxation, if it be such, was not apparently a payment for which recourse could be had to the Act of 1873, for the act is not mentioned in the decision. The court decided that

the taxation was not voluntary, but on common-law principles. The company in that case did not attempt to bring itself within the purview of the statute, either because it had no such right or for other reasons. The case is only authority for the common-law principle of voluntary payments.

The other cases from Tennessee cited by the Government were for the recovery of taxation made by counties which the Supreme Court of Tennessee said did not fall within the purview of the Act of 1873.

We have also examined a number of the Federal Supreme Court cases and we do not find that they affect the question.

The greater part of our act was taken from Tennessee, but an inspection of it makes it evident that the whole act could not have been taken from that State, as our own act changes the Injunction Law which in itself gives the act a slightly different aspect. Moreover, we should not follow another State blindly when we are considering local conditions. In the *Guerra* case, *supra*, it was pointed out by this court that our Legislature had established a completely new system in taxation matters, cutting off the old contentious administration remedy and making necessary an appeal to the Board of Equalization and Review. The opinion insists that the complainants there might have resorted to injunction. The law of 1911 absolutely cut off such right; abolished all other remedies except the recourse to the statute itself. Hence, there is no room for the suggestion that its terms must be construed strictly against the taxpayer.

The principal consideration that should guide us, however, is the construction of the statute itself, reading:

"Section 1.—That in all cases in which an officer charged by law with the collection of revenue due the Government of Porto Rico, shall institute any proceeding or take any steps for the collection of the same, alleged or claimed by such officer to be due from any person, the party against whom the proceeding or step is taken shall, if he conceives the same to be unjust or illegal, or against any statute, pay the same under protest.

"Section 2.—Be it further enacted that upon his making such payment, the officer or collector shall pay such revenue into the Treasury of Porto Rico, giving notice at the time of the payment to the Treasurer that the same was paid under protest.

"Section 3.—Be it further enacted that the party paying said revenue under protest may, at any time within thirty days after making said payment, and not longer thereafter, sue the said Treasurer for said sum, for the recovery thereof in the court having competent jurisdiction thereto; and if it be determined that the same was wrongfully collected as not being due from said party to the Government for any reason going to the merits of the same, the court trying the case may certify of record that the same was wrongfully paid, and ought to be refunded, and thereupon the Treasurer shall repay the same, which payment shall be made in preference to other claims on the Treasury.   Either party to said suit shall have the right of appeal to the Supreme Court.

"Section 4.—Be it further enacted that there shall be no other remedy in any case of the collection of revenue, or attempt to collect revenue illegally.

"Section 5.—Be it further enacted that no writ for the prevention of the collection of any revenue claimed, or to hinder and delay the collection of the same, shall in any wise issue, either supersedeas, prohibition, or any other writ or process whatever; but in all cases in which, for any reason, any person shall claim that the tax so collected was wrongfully or illegally collected, the remedy for said party shall be as above provided, and none other.

"Section 6.—Be it further enacted that, Section 12 of the Act of March 8, 1906, entitled 'An Act to define injunctions and to prescribe when they may be issued, and to repeal an Act authorizing injunctions, approved March 1, 1902, and all laws in conflict herewith,' is hereby amended so as to read as follows:

" 'An injunction may be granted, upon the petition of The People of Porto Rico, to enjoin and suppress the keeping and maintaining of a common nuisance.   The petition shall be verified by the *fiscal* of the district in which the common nuisance exists, or by the Attorney General, upon information and belief, and no bond shall be required.'

"Section 7.—Be it further enacted that this Act shall take effect immediately upon its approval."

We had the statute before us in *Ensenada Estates* v. *Hill*. 24 P. R. R. 462.   On pages 481 *et seq.* we considered the

limitation of the maxim *Noscitur a sociis.* You may know the meaning of a term by its associates when not apparent from the language itself. The disjunctive in the first paragraph of the law militates against the theory that the legislature in saying "shall institute any proceeding or take any steps" was associating a slightly different form of the same concept.

*To collect* frequently means a measure outside of courts. *People* v. *Reis,* 18 Pac. 313; 11 C. J. 967. "To take any steps" is a most general way of expressing any kind of action to collect. *To take steps* is equivalent to take action, to move in the matter. Webster's New International Dictionary, Century Dictionary, p. 6164, No. 35; and, curiously enough, the words are almost necessarily defined in the citation we have made from *Railroad Company* v. *Commissioners,* 98 U. S. 545, *supra.* Says the court through Mr. Justice Waite: "After all the taxes had become delinquent under the law, but before any active steps whatever had been taken to enforce their collection." The word "steps" is evidently used in a most general way as signifying action.

Section 4 of Act No. 35 of 1911 is a fresh enactment of the Legislature that there shall be no other remedy in the case of collection of, *or attempt to collect, revenue illegally.* If what was done here was not an attempt to collect it was nothing.

Section 5 again inhibits all legal remedies other than a recourse to the statute and says that in all cases the remedy shall be as above provided. If any doubt remains of the original definition in section 1, the cases for which action might have obtained before are necessarily hereby brought within the legislative provision.

The first impression of the statute, its ordinary common-sense meaning, were before us in the case of *Ensenada Estates* v. *Hill, supra.* This court said, on page 484:

"The words of the law are perfectly plain and simple and if given their ordinary everyday meaning leave no room for doubt as to the purpose in the mind of the legislator.   Any attempt to paraphrase the broad language of the text without elaboration thereof is apt to result in such restriction of its self-evident meaning as would amount to elimination.

"Section 1 refers to all cases in which the Government seeks to recover taxes alleged or claimed to be due, and requires the alleged delinquent, if he conceives the same to be unjust or illegal or against any statute, to pay the same under protest.   Then the taxpayer may sue to recover the sum so paid and if, for any reason going to the merits, it be determined that the same was wrongfully collected as not being due, the trial court may certify that the same was wrongfully paid and ought to be refunded and thereupon the Treasurer shall repay the same.   And, finally, in all cases in which for any reason any person shall claim that the tax so collected was wrongfully or illegally collected, the remedy shall be as above provided and none other.   The Legislature thus says to the taxpayer: 'Henceforth you shall not prevent, hinder, or delay the collection of any revenue alleged or claimed to be due the Government, however unjust or wrongful such claim may be, but you shall pay the same whether due or not and regardless of any and all questions of right and justice; and in compensation for the loss of your equitable remedies and for the hardship involved in such compulsory payment you may then show, if you can, that for any reason going to the merits such sum was unjustly or wrongfully collected as not being due, and ought to be refunded, in which event the court will so certify and the Treasurer shall reimburse you.' "

Although the exact question now before us was not raised in that case, we find no reason to change our original impression of what is a plain statute.

If the act were at all doubtful, it would be aided by its title, which is as follows: "Providing for the payment of taxes under protest, establishing a proceeding for the recovery thereof, and for other purposes."   In other words, the act, contrary to what the Government maintains, is an act for the payment of taxes under protest and for the recovery thereof.

It is therefore unnecessary to consider the fact that the payment was made before the property could actually be attached. The tax, if legal, was actually due.

The Government also maintains that the appellant is not the proper person to sue for the recovery of these taxes. It appears that the latter were assessed against two other corporations, but it also appears that appellant paid the taxes as the assignee of these corporations and is the present owner of the properties sought to be taxed. Hence the objection cannot prevail.

The judgment must be reversed and the case remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

Chief Justice Hernández and Justices del Toro, Aldrey and Hutchison concurred.